No. 23-35579

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OREGON WILD and WILDEARTH GUARDIANS,

*Plaintiffs-Appellants*,

v.

UNITED STATES FOREST SERVICE, MICHAEL RAMSEY, JEANETTE
WILSON, RANDY MOORE, and THOMAS VILSACK,

*Defendants-Appellees*.

On Appeal from the United States District Court for the District of Oregon,
No. 1:22-cv-01007-MC

## APPELLANTS' OPENING BRIEF

Oliver J. H. Stiefel
Tel: 503.227.2212-2725
oliver@crag.org
Meriel L. Darzen
Tel: 503.525.2725
meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, OR 97214
Fax: 503-296-5454

*Attorneys for Plaintiffs-Appellants*

Erin Hogan-Freemole
Tel: 971.417.5851
ehoganfreemole@wildearthguardians.org
WILDEARTH GUARDIANS
213 SW Ash Street, Suite 202
Portland, OR 97204

December 6, 2023

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants Oregon Wild and WildEarth Guardians hereby state that they have no parent companies, no subsidiaries or subordinate companies, and no affiliates that have issued shares to the public.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................v

GLOSSARY OF TERMS ............................................................................ xiii

INTRODUCTION...........................................................................................1

STATEMENT OF JURISDICTION .................................................................3

   I.    Subject Matter Jurisdiction of the District Court ............................3

   II.   Jurisdiction of the Court of Appeals ...............................................3

   III.   Timeliness of Appeal......................................................................3

STATEMENT OF THE ISSUES ......................................................................3

STATEMENT OF ADDENDUM ......................................................................4

STATEMENT OF THE CASE .........................................................................5

STATEMENT OF LAW AND FACTS .............................................................9

   I.    Statutory Framework......................................................................9

      A.   The Administrative Procedure Act ......................................9

      B.   The National Environmental Policy Act ...........................11

   II.   The Forest Service's CE Regulatory Regime ..............................12

      A.   The Forest Service Adopted a CE for "Low-Impact Silvicultural Activities."...............................................................................12

      B.   The Forest Service Adopted CE-6 as Part of a 1991/1992 Rulemaking Package that Was Overturned in Part. ..................................14

      C.   The Forest Service Next Adopted New, Small-Scale Logging CEs. ........16

      D.   The Forest Service Later Adopted Another Logging-Related CE but this Court Enjoined It. ..............................................................17

      E.   In 2020, the Forest Service Adopted a New CE Involving Commercial Logging and Determined It Must Be Capped at 2,800 Acres to Stay Below the Level of Significance. ........................................19

   III.   Application of CE-6..................................................................20

      A.   The Forest Service Historically Reviewed and Approved Larger-Scale Commercial Logging Projects Via EIS or EA, or Kept Commercial Logging Below the Logging CEs' Acreage Caps. ................20

B. The Forest Service Began Expanding the Use of CE-6 Around 2018. ..................................................................23

C. In a Six-Month Timeframe, the Forest Approved Three Large-Scale Commercial Logging Projects Under CE-6. ..................25

V. Proceedings Below .....................................................................27

SUMMARY OF THE ARGUMENT ..................................................28

ARGUMENT .........................................................................................30

I. CE-6 Does Not Cover Commercial Logging Operations of this Type and Scale. ..........................................................................30

A. Standard of Review ................................................................30

B. The Type—*and Scale*—of a Project Dictates Whether It Is Eligible for a CE ...................................................................32

C. The Text, Structure, History, and Purpose of CE-6 Demonstrate that It Does Not Cover Large-Scale Commercial Logging Operations. ...35

II. Wild's As-Applied Challenge to CE-6 is Timely. ....................39

A. Standard of Review ................................................................40

B. Claims that an Agency Exceeded Its Authority May Be Brought within Six Years of the Decision's Adverse Application. ..................40

C. *Wind River* Applies to Substantive Claims, Not Substantive Laws. .........43

III. If CE-6 Permits the Projects' Commercial Logging Operations, the Forest Service Exceeded Its Authority in Adopting CE-6. ..................51

A. Standard of Review ................................................................51

B. The Forest Service Exceeded Its Authority in Applying CE-6 to Large-Scale Commercial Logging Operations. ..................52

1. The Forest Service Lacked the Authority to Adopt a CE for Large-Scale Commercial Logging Operations. ..................54

2. The Forest Service's Interpretation of NEPA and 40 C.F.R. § 1508.4 as Permitting Large Scale Commercial Logging Flatly Contradicts NEPA's Text and Purpose ..................56

IV. The District Court's Denial of Wild's Request to Take Judicial Notice Should Be Reversed. ..................................................58

A. Standard of Review ................................................................59

   B.   The District Court Abused Its Discretion in Denying the Request
       to Take Judicial Notice. ................................................................59

  V.  Relief ...............................................................................................60

CONCLUSION ........................................................................................61

CERTIFICATE OF COMPLIANCE ....................................................... I

STATEMENT OF RELATED CASES ................................................... II

CERTIFICATE OF SERVICE ..............................................................III

# TABLE OF AUTHORITIES

**Cases**

*Acri v. Int'l Ass'n of Machinists & Aerospace Workers*,
781 F.2d 1393 (9th Cir. 1986) ..............................................49

*Alaska Ctr. for the Env't v. U.S. Forest Serv.*,
189 F.3d 851 (9th Cir. 1999)..............................................6, 31

*All. for the Wild Rockies v. Weber*,
979 F. Supp. 2d 1118 (D. Mont. 2013)..............................20, 22

*Allied Signal, Inc. v. U.S. NRC*,
988 F.2d 146 (D.C. Cir. 1993) ..............................................60

*Artichoke Joe's California Grand Casino v. Norton*,
278 F. Supp. 2d 1174 (E.D. Cal. 2003)..............................47

*Cal. Comm'ys Against Toxics v. U.S. EPA*,
688 F.3d 989 (9th Cir. 2012) ..........................................60, 61

*Cal. Sea Urchin Comm'n v. Bean*,
828 F.3d 1046 (9th Cir. 2016) ....................10, 41–45, 49, 50

*California v. Norton*,
311 F.3d 1162 (9th Cir. 2002) ..............................................32

*Churchill County v. Norton*,
276 F.3d 1060, 1072 (9th Cir. 2001) ..............................54

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971)..............................................................31

*Colo. Wild v. U.S. Forest Serv.*,
435 F.3d 1204 (10th Cir. 2006) ..........................................17

*Ctr. for Biological Diversity v. Salazar*,
695 F.3d 893 (9th Cir. 2012) ..............................................41

*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Rec.*,
 655 F.3d 1000 (9th Cir. 2011) ..............................................................59

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
 140 S. Ct. 1891 (2020) ........................................................................10

*Dep't of Transp. v. Pub. Citizen*,
 541 U.S. 752 (2004)............................................................................56

*Dixon v. United States*,
 381 U.S. 68 (1965).............................................................................57

*Donovan v. Crisostomo*,
 689 F.2d 869 (9th Cir. 1982) ..............................................................52

*Environmental Protection Information Center v. Carlson*,
 968 F.3d 985 (9th Cir. 2020) .........................................8, 32–34, 36, 38

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
 36 F.4th 850 (9th Cir. 2022) ...............................................................60

*Forestkeeper v. U.S. Forest Serv.*,
 No. 1:21-cv-0141-DAD-BAM, 2021 U.S. Dist. LEXIS 192443 (E.D. Cal. Oct. 5,
 2021) ...................................................................................................34

*Friends of Blackwater v. Salazar*,
 691 F.3d 428 (D.C. Cir. 2012) ............................................................52

*Functional Music, Inc. v. FCC*,
 274 F.2d 543 (D.C. Cir. 1958) ............................................................42

*Harrosh v. Tahoe Regional Planning Agency*,
 640 F. Supp. 3d 962 (E.D. Cal. 2022)..................................................45

*Heartwood, Inc. v. U.S. Forest Serv.*,
 230 F.3d 947 (7th Cir. 2000) ..............................................................15

*Heartwood, Inc. v. U.S. Forest Serv.*,
 73 F. Supp. 2d 962 (S.D. Ill. 1999)..........................................15, 16, 54

*Johnson v. Shalala*,
  2 F.3d 918 (9th Cir. 1993) ..................................................................53

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ............................................................59

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019).................................................8, 31, 35, 39

*Legal Envtl. Assistance Found*. v. *U.S. EPA* ("*LEAF*"),
  118 F.3d 1467 (11th Cir. 1997) ...............................................41, 48, 57

*Los Padres ForestWatch v. U.S. Forest Serv*.,
  25 F.4th 649 (9th Cir. 2022) ........................................................24, 25

*Maceren v. Dist. Dir., Immigration & Naturalization Serv.*,
  509 F.2d 934 (9th Cir. 1974) ..........................................................37

*Mtr. Vehicle Mfrs. Ass'n v. St. Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)...........................................................................31

*Mt. Cmtys. for Fire Safety v. Elliott*,
  25 F.4th 667 (9th Cir. 2022) ...........................7, 24–29, 32, 35, 37

*Nat. Res. Def. Council v. Nuclear Regul. Comm'n*,
  666 F.2d 595 (D.C. Cir. 1981) .......................................................43

*Native Ecosystems Council v. Dombeck*,
  304 F.3d 886 (9th Cir. 2002) ..........................................................53

*Native Ecosystems Council v. Marten*,
  No. CV 17-77-M-DLC, 2018 U.S. Dist. LEXIS 208001 (D. Mont. Dec. 10,
  2018) ..............................................................................................20

*NLRB Union v. Fed. Labor Relations Auth.*,
  834 F.2d 191 (1987)........................................................................41

*Norfolk Energy, Inc. v. Hodel*,
  898 F.2d 1435 (9th Cir. 1990) .........................................................37

*Northstar Fin. Advisors, Inc. v. Schwab Invs.*,
  779 F.3d 1036 (9th Cir. 2015) ...............................................59

*NRDC v. U.S. EPA*,
  857 F.3d 1030 (9th Cir. 2017) ...............................................56

*Nw. Envtl. Advocates. v. U.S. EPA*,
  537 F.3d 1006 (9th Cir. 2008) .........................................40, 58

*Nw. Envtl. Def. Ctr. v. Brown*,
  640 F.3d 1063 (9th Cir. 2011) ...............................................50

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) ........................................................44, 49

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
  625 F.3d 1092 (9th Cir. 2010) ...............................................59

*Padilla v. City of Richmond*,
  509 F. Supp. 3d 1168 (N.D. Cal. 2020) .................................60

*Perez-Guzman v. Lynch*,
  835 F.3d 1066 (9th Cir. 2016) .....................................41, 43, 48

*Pit River Tribe v. U.S. Forest Serv.*,
  469 F.3d 768 (9th Cir. 2006) .................................................30

*Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*,
  946 F.3d 1100 (9th Cir. 2020) ..........................................52, 55

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ........................................................11, 53

*Safari Club Int'l v. Haaland*,
  31 F.4th 1157 (9th Cir. 2022) ...............................................52

*Shiny Rock Min. Corp. v. United States*,
  906 F.2d 1362 (9th Cir. 1990) ...............................................44

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) .................................................................18, 38, 43

*Sierra Club v. Penfold*,
    857 F.2d 1307 (9th Cir. 1988) .................................................................44

*Steamboaters v. Fed. Energy Regulatory Com*,
    759 F.2d 1382 (9th Cir. 1985) .................................................................54

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .................................................................49

*United Keetoowah Band of Cherokee Indians in Okla. V. FCC*,
    933 F.3d 728 (D.C. Cir. 2019) .................................................................54

*United States v. LKAV*,
    712 F.3d 436 (9th Cir. 2013) .................................................................57

*Utu Utu Gwaitu Paiute Tribe of Benton Paiute Reserv. v. Dep't of Interior*,
    766 F. Supp. 842 (E.D. Cal. 1991) .................................................................43, 45

*Vieux v. East Bay Regional Park Dist.*,
    893 F.2d 1558 (9th Cir. 1990) .................................................................49

*Watt v. Alaska*,
    451 U.S. 259 (1981) .................................................................58

*West v. Sec'y of the Dep't of Transp.*,
    206 F.3d 920 (9th Cir. 2000) .................................................................32, 36

*Wild Va. v. Council on Envtl. Quality*,
    56 F.4th 281 (4th Cir. 2022) .................................................................5

*Winter Wildlands All. v. U.S. Forest Serv.*,
    No. 1:11-CV-586-REB, 2013 U.S. Dist. LEXIS 47728 (D. Idaho Mar. 29, 2013)
    .................................................................46

## Statutes

5 U.S.C. § 702 ...............................................................................10

5 U.S.C. § 704 .................................................................................3

5 U.S.C. § 706 .............................................................27, 31, 47, 48, 60

16 U.S.C. § 6591 ........................................................................12, 57

28 U.S.C. § 1291 ..............................................................................3

28 U.S.C. § 1331 ..............................................................................3

28 U.S.C. § 1346 ..............................................................................3

42 U.S.C. § 4321 .............................................................................11

42 U.S.C. § 4332 .........................................................5, 11, 53, 56, iv

42 U.S.C. § 4342 ........................................................................11, 56

42 U.S.C. § 4344 ........................................................................11, 56

## Regulations

36 C.F.R. § 220.6 .....................................................................passim

40 C.F.R. § 1500.1 (2019)................................................................11

40 C.F.R. § 1501.4 (2019)...............................................................6, 11

40 C.F.R. § 1501.4 (2021).................................................................6

40 C.F.R. § 1501.5 (2021)................................................................11

40 C.F.R. § 1507.1 (2019)................................................................11

40 C.F.R. § 1507.3 (2019).........................................................5, 12, 54

40 C.F.R. § 1508.4 (2019)...............................................................passim

40 C.F.R. § 1508.7 (2019)...........................................................26, 55

40 C.F.R. § 1508.8 (2019).................................................................12

40 C.F.R. § 1508.25 (2019)...............................................................55

40 C.F.R. § 1508.27 (2019)...............................................................12

**Other Authorities**

50 Fed. Reg. 26,078 (June 24, 1985)...............................................13

56 Fed. Reg. 19,718 (April 29, 1991) ............................................7, 14

57 Fed. Reg. 43,180 (Sept. 18, 1992)...............................................14

67 Fed. Reg. 77,038 (Dec. 16, 2002) ...............................................18

68 Fed. Reg. 1,026 (Jan. 8, 2003)......................................................16

68 Fed. Reg. 33,814 (June 5, 2003)...................................................18

68 Fed. Reg. 44,598, 44,599 (July 29, 2003) ..................................16

73 Fed. Reg. 43,084 (July 24, 2008) .................................................13

84 Fed. Reg 27,544 (June 13, 2019)..................................................19

85 Fed. Reg. 43,304 (July 16, 2020) ..................................................5

85 Fed. Reg. 73,620 (Nov. 19, 2020) ................................................19

87 Fed. Reg. 23,453 (April 20, 2022) .................................................5

**Rules**

Ninth Circuit Rule 28-2.7 .............................................................................4

Federal Rule of Appellate Procedure 4 ....................................................3

Federal Rule of Appellate Procedure 26.1 ...............................................i

# GLOSSARY OF TERMS

| | |
|---|---|
| Agency | United States Forest Service |
| APA | Administrative Procedure Act |
| Board foot | A unit of measurement for a piece of lumber 12"x12"x1" (144 cubic inches). One million board feet (often abbreviated as "mmbf") is equivalent to roughly 200 logging trucks' worth of timber. |
| CE | Categorical Exclusion |
| CE-6 | 36 C.F.R. § 220.6(e)(6) |
| CEQ | Council on Environmental Quality |
| Defendants | All named Defendants |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| Forest | Fremont-Winema National Forest |
| Forest Service | United States Forest Service |
| Girdling | A method of killing trees without cutting them down. This method is often used to create "snags," which are standing, dead trees that provide important wildlife habitat. |
| Impact or Effect | Used synonymously to describe ecological, aesthetic, historic, cultural, economic, social, or health consequences of an action, whether direct, indirect, or cumulative. "Direct" effects are caused by an action and occur at the same time and place. "Indirect" effects are caused by an action and are later in time or farther removed in distance. "Cumulative" effects result from the incremental effect of an action when added to other past, present, and reasonably foreseeable future actions. |
| Logging | Any silvicultural method employed for the purpose of cutting and removing trees. Logging can involve a variety of techniques including "thinning," "clearcutting," etc. Logging operations can involve felling trees, skidding felled trees to landings, building and maintaining roads, hauling logs on roads, and other associated activities. |
| NEPA | National Environmental Policy Act |
| Plaintiffs or Wild | All named Plaintiffs |
| Projects | South Warner, Baby Bear, and Bear Wallow Projects |
| Salvage | Commercial harvest of dead and dying trees. |

# INTRODUCTION

Appellants Oregon Wild and WildEarth Guardians ("Wild") challenge the Forest Service's approval of three logging projects ("Projects") that authorize commercial logging operations across a collective total of 29,000 acres (45 square miles) on the Fremont-Winema National Forest ("Forest") in southern Oregon.

Commercial logging—especially on the scale authorized here—can have significant environmental impacts including wildlife habitat fragmentation and degradation of water quality. Nevertheless, the Forest Service did not analyze and publicly disclose these foreseeable effects in an Environmental Impact Statement ("EIS"), or even a less intensive Environmental Assessment ("EA") as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h. Instead, the agency approved the Projects pursuant to a categorical exclusion ("CE"): 36 C.F.R. § 220.6(e)(6) ("CE-6").

Wild challenges the approvals of the Projects on two grounds. First, under no reasonable interpretation can CE-6—applicable to "timber stand and/or wildlife habitat improvement activities"—apply to the Projects at issue, which involve thousands of acres of commercial logging. The District Court erroneously held that Wild's challenge was foreclosed by CE-6's plain language, which does not contain an explicit acreage limitation. But scale is a necessary element of CE-6— as well

as every other CE—because CEs are reserved for small, low-impact, and routine activities that have been predetermined to not have significant effects.

Second, if CE-6 does cover the Projects, then CE-6 itself is unlawful as applied. In adopting CE-6, the Forest Service never determined that commercial logging operations of the scale authorized by the Projects would have no significant environmental impacts, a necessary precondition for adopting a CE. Moreover, CE-6's exemption of large-scale commercial logging operations from full environmental review directly conflicts with NEPA.

The District Court mischaracterized the second claim as "procedural" and dismissed it as time-barred, concluding that the cause of action accrued when CE-6 was adopted in 1992. But this is not a facial, procedural challenge; it is a substantive claim that the agency exceeded its authority by exempting large-scale commercial logging operations from full environmental review. Wild's cause of action accrued when the agency applied CE-6 to the Projects in 2021 and 2022, and this action is therefore well within the six-year statute of limitations.

Wild respectfully requests that this Court reverse the judgment of the District Court, vacate the Projects' approvals of commercial logging operations, and remand for preparation of EISs or EAs. Alternatively, if the Projects do fall within CE-6's scope, Wild respectfully requests that this Court hold that Wild's as-applied challenge to CE-6 is timely, and further declare CE-6 unlawful as applied.

# STATEMENT OF JURISDICTION

## I.     Subject Matter Jurisdiction of the District Court

The District Court had jurisdiction over this matter pursuant to 28 U.S.C.
§ 1331 and 28 U.S.C. § 1346 because this civil action involves the United States as
a defendant and arises under federal laws, including the National Environmental
Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure
Act ("APA"), 5 U.S.C. §§ 701 *et seq*.

## II.     Jurisdiction of the Court of Appeals

This Court has jurisdiction because this is an appeal of a final decision of the
District Court of Oregon. 28 U.S.C. § 1291.

## III.     Timeliness of Appeal

The district court entered judgment on August 4, 2023. 1-ER-009. Pursuant
to Federal Rule of Appellate Procedure 4(a)(1)(B)(ii), Wild timely filed its Notice
of Appeal on August 28, 2023. 3-ER-383.

# STATEMENT OF THE ISSUES

1.     Whether the Forest Service violated NEPA by interpreting the
categorical exclusion for "timber stand and/or wildlife habitat improvement
activities," 36 C.F.R. § 220.6(e)(6), to cover three large-scale logging projects
involving 3,000, 11,000, and 16,000 acres of commercial operations, respectively,

where categorical exclusions are reserved for small, routine, and low-impact activities?

2.     Whether the district court erred in holding that Wild's substantive, as-applied challenge to 36 C.F.R. § 220.6(e)(6) was time barred, where Wild's right of action did not accrue until 2021, when CE-6 was first applied to large-scale commercial logging operations in a manner that harmed Wild's interests?

3.     Whether, if 36 C.F.R. § 220.6(e)(6) allows the scale of commercial logging operations authorized by the Projects, it is unlawful as applied because the Forest Service exceeded its authority (1) in adopting CE-6 where it failed to make the required finding that such commercial logging operations have no individually or cumulatively significant impacts, and (2) where CE-6 flatly contradicts NEPA and its implementing regulations?

4.     Whether the district court erred in denying Wild's request for judicial notice where the proffered records are publicly available agency NEPA documents?

## STATEMENT OF ADDENDUM

Pursuant to Circuit Rule 28-2.7, all pertinent statutes and regulations are included in an addendum to this brief.

///

///

## STATEMENT OF THE CASE

Wild challenges the Forest Service's final agency actions in approving—via categorical exclusion from full NEPA review—29,000 acres of commercial logging operations in three Projects: South Warner, Bear Wallow, and Baby Bear. In the alternative, Wild challenges the categorical exclusion itself as applied to the commercial aspects of the Projects.

NEPA requires federal agencies to fully evaluate and publicly disclose the environmental impacts of and alternatives to all proposed actions that may have a significant effect on the environment. *See* 42 U.S.C. § 4332(2)(C). Council on Environmental Quality ("CEQ") regulations implementing NEPA permit agencies to *ex ante* exempt certain classes of activities from full project-level environmental review. *See* 40 C.F.R. § 1508.4 (2019).[1] To avail itself of this latter approach, an agency must determine—in formal rulemaking—that a class of activities will have no individually or cumulatively significant environmental impacts. 40 C.F.R. §§ 1507.3(b), 1508.4. These are "categorical exclusions," or CEs.

---

[1] The CEQ regulations remained virtually unchanged since their adoption in 1978. *See Wild Va. v. Council on Envtl. Quality*, 56 F.4th 281 (4th Cir. 2022). CEQ modified the NEPA regulations in 2020, then rescinded some modifications in 2022. *See* 85 Fed. Reg. 43,304 (July 16, 2020); 87 Fed. Reg. 23,453 (April 20, 2022). Unless otherwise noted, citations are to the 1978 version, last codified in 2019, under which the Forest Service adopted CE-6. *See* 3-ER-342–50.

Pursuant to this authority, the Forest Service has adopted a series of CEs. To ensure against significant effects, many of the CEs contain an explicit cap on project size; for CEs with no size cap, the covered activities are necessarily routine and low-impact. *See, e.g.*, 36 C.F.R. § 220.6(d)(3)(ii) ("Mowing lawns"). The Forest Service has **never** found through formal rulemaking that commercial logging on the scale authorized by the Projects—between 3,000 and 16,000 acres, and cumulatively 29,000 acres—causes no significant environmental effects. Indeed, even if the agency had asserted that commercial logging projects of such scale could fall within a CE—which it never did—it could not have supported this conclusion, which runs flatly contrary to NEPA. *See Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) ("Categorical exclusions, by definition, are limited to situations where there is an insignificant or minor effect on the environment.").[2]

At the project level, an agency must determine whether a selected CE "covers" project activities. *See* 40 C.F.R. § 1501.4 (2021).[3] The Forest Service

---

[2] Cases have been cleaned up, with internal citations omitted, unless otherwise noted.

[3] The regulatory language, whether a CE "covers a proposed action," appears in the 2021 version of the regulations, 40 C.F.R. § 1501.4 (2021), in force at the time the Forest Service approved the Projects, but the previous version of the regulations envisioned a similar inquiry. *See* 40 C.F.R. § 1501.4 (2019); *see also Alaska Ctr.*, 189 F.3d at 857 (asking whether a proposed action "falls within" a CE).

approved the Projects here pursuant to CE-6, which it adopted in 1992 as part of a rulemaking package designed to replace its former CE authorizing "low-impact silvicultural activities" with narrower and better-defined categories. 3-ER-353 (56 Fed. Reg. 19,718, 19719 (April 29, 1991)). In this rulemaking, the Forest Service never analyzed commercial logging under CE-6, and thus never found that it would have only minimal impacts. The agency discussed commercial logging only in the context of a different, size-limited CE—which was later enjoined because the Forest Service had failed to show that the relatively small-scale logging activities would have no significant impact. The rulemaking never analyzed large-scale logging at all.

For nearly 30 years, the Forest Service applied CE-6 to noncommercial activities, which differ from commercial logging operations in the magnitude of environmental impacts because of, *inter alia*, the need for heavy machinery, the size of trees cut, and the process of removing merchantable trees from the forest. Commercial logging was instead authorized under an EA, EIS, or one of the size-limited logging CEs. Only in recent years has the Forest Service begun to authorize commercial projects under CE-6.

Although this Court has upheld projects authorizing relatively small amounts of commercial logging under CE-6, *see Mt. Cmtys. For Fire Safety v. Elliott*, 25 F.4th 667 (9th Cir. 2022) ("*Mountain Communities*"), the Projects here are orders

of magnitude larger. This Court never has addressed the applicability of CE-6 to such large-scale commercial projects.

In contrast, the scale of commercial logging approved via another CE was directly at issue in *Environmental Protection Information Center v. Carlson* ("*EPIC*"), 968 F.3d 985 (9th Cir. 2020). There, this Court held that an extensive commercial logging project could not be approved under a CE, as the "rationale for a CE is that a project that will have only a minimal impact on the environment should be allowed to proceed without an EIS or an[] EA." *Id.* at 990.

Wild first claims that, in consideration of its "text, structure, history, and purpose," *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019), under no reasonable interpretation can CE-6 cover the Projects. The type and scale of the Projects—commercial logging operations across thousands of acres—is patently unfit for a CE. In concluding otherwise, and consequently failing to prepare an EA or EIS, the Forest Service acted arbitrarily, capriciously, and contrary to NEPA.

If, however, CE-6 can be interpreted to permit the type and scale of commercial logging operations authorized by the Projects, Wild alternatively claims that CE-6 is unlawful as applied. CE-6's exemption of such activities from full environmental review under NEPA exceeds the Forest Service's authority because (1) in adopting CE-6, the agency never made the required finding that large-scale commercial logging operations cause no significant effects, and (2)

using CE to exempt such activities from full NEPA review directly conflicts with NEPA and CEQ regulations.

The District Court dismissed Wild's second claim as time-barred, describing it as a "procedural challenge" and concluding that the cause of action accrued in 1992 when CE-6 was adopted. But this holding misconstrues the nature of the substantive, as-applied challenge that Wild brings here. Wild does not facially challenge the adoption of CE-6 based on procedural irregularities, such as the failure to conduct notice and comment rulemaking. Instead, Wild argues that the Forest Service exceeded its authority by exempting large-scale commercial logging operations from full NEPA review. *See Wind River Mining Corp. v. United States*, 946 F.2d 710, 715–16 (9th Cir. 1991). Wild's right of action did not accrue until the Forest Service actually applied CE-6 in this manner so as to harm Wild's interests: the three Projects, approved in 2021 and 2022. *See id.* Wild's as-applied challenge is thus well within the statute of limitations.

## STATEMENT OF LAW AND FACTS

### I. Statutory Framework

#### A. The Administrative Procedure Act

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, confers a right of judicial review on any person adversely affected or aggrieved by final agency action for which there is no other adequate remedy in a court. *Id*. §§ 702,

704. Courts shall "hold unlawful and set aside agency action" that is "arbitrary, capricious * * * or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2). Although rebuttable, the "APA establishes a basic presumption of judicial review[.]" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020).

Claims under the APA must be brought within six years of the challenged agency action. 28 U.S.C. § 2401(a); *Wind River*, 946 F.2d at 712. Section 2401(a) is not jurisdictional. *See Cedars-Sinai Medical Ctr. v. Shalala*, 125 F.3d 765, 770 (9th Cir. 1997).

This Court allows certain challenges to agency decisions after more than six years when tied to a later agency action applying the earlier decision: a substantive, as-applied challenge "alleging lack of agency authority may be brought within six years of the agency's application of that decision[.]" *Wind River*, 946 F.2d at 716; *see also Cal. Sea Urchin Comm'n v. Bean*, 828 F.3d 1046, 1050 (9th Cir. 2016). This doctrine "strikes the correct balance between the government's interest in finality and a challenger's interest in contesting an agency's alleged overreaching." *Wind River*, 946 F.2d at 715.

///

///

**B.     The National Environmental Policy Act**

Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. To this end, NEPA and its implementing regulations set forth "action-forcing" procedures designed to (1) ensure agencies take a "hard look" at the environmental effects of a proposed action, and (2) foster meaningful public participation. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989).

Congress also established the CEQ to implement NEPA and develop national policies to promote environmental quality. 42 U.S.C. § 4342; *id.* § 4344(4); 40 C.F.R. § 1500.1. "All agencies of the federal government shall comply with [CEQ] regulations." 40 C.F.R. § 1507.1.

To effect NEPA's lofty goals, agencies must prepare "detailed statement[s]" for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Commonly known as an EIS, this statement must describe, *inter alia*, the adverse environmental impacts of the proposed action and its alternatives. *Id.*; *see also id.* § 4332(2)(E). If the significance of a proposed action is uncertain, an agency may prepare a less-rigorous EA, a concise public document that describes the proposal and examines reasonable alternatives. 40 C.F.R. §§ 1501.4(b), 1508.9; *see also* 40 C.F.R. § 1501.5(a) (2021).

Agencies also may adopt CEs for categories of actions

> which do not **individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect** in procedures adopted by a federal agency in implementation of [CEQ] regulations (§ 1507.3) and for which, therefore, neither an [EA] nor an [EIS] is required.

40 C.F.R. §§ 1507.3, 1508.4 (emphasis added); *see also* 40 C.F.R. §§ 1508.8

(defining "effects"), 1508.27 (defining "significantly").[4] Pursuant to this authority,

the Forest Service has adopted a series of logging-related CEs.[5]

## II.     The Forest Service's CE Regulatory Regime

The genesis of CE-6 provides relevant context for this case; coupled with

more recent rulemaking, it demonstrates that scale is a necessary element of the CE

regime. Further, this history shows that in adopting CE-6, the Forest Service never

addressed the impacts of large-scale commercial logging—and that Wild's first

opportunity to challenge its application to such activities came in 2021.

### A.     The Forest Service Adopted a CE for "Low-Impact Silvicultural Activities."

In 1985, the Forest Service adopted a final policy revising its NEPA

procedures, including expanding the classes of activities that might be

---

[4] Agencies must also provide for "extraordinary circumstances," "in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4.

[5] In addition to the agency's regulatory CEs, Congress has promulgated logging-related CEs that contain acreage limitations and various other restrictions *See* 16 U.S.C. §§ 6591b–6591e.

categorically excluded from full review in an EA or EIS. 3-ER-369–72 (50 Fed. Reg. 26,078 (June 24, 1985)).[6] One of the new categories covered "**Low-impact** silvicultural activities that are **limited in size** and duration and that primarily use existing roads and facilities, such as firewood sales, salvage, thinning, and small harvest cuts; site-preparation; and planting and seeding." 3-ER-372 (emphasis added).

To assuage public concern that projects might evade sufficient environmental analysis, the agency emphasized that "actions may be categorically excluded from documentation **only** if both past experience and environmental analysis **demonstrate that no significant effects on the human environment will result**, individually or cumulatively." 3-ER-372 (second emphasis added). "The guiding [principle] is that the depth and breadth of the environmental analysis, the extent of public involvement, and the type of documentation must be commensurate with the **scale and intensity** of the anticipated effects." *Id.* (emphasis added).

In 1987, environmental groups petitioned the Forest Service to amend its CEs, including the "low-impact silvicultural activity" CE, asking that the agency

---

[6] The Forest Service's NEPA procedures, including its CEs, resided in the Forest Service Manual and Forest Service Handbook until codified at Title 36, Part 220 in 2008. 2-ER-263 (73 Fed. Reg. 43,084 (July 24, 2008)). This codification was purely ministerial. 2-ER-267.

(1) more specifically describe the relevant actions and (2) prohibit and immediately cease the categorical exclusion of "timber sales involving more than 25,000 board feet or more than one acre." 3-ER-353 (56 Fed. Reg. 19,718 (April 29, 1991)). In response, the Forest Service issued an interim directive limiting timber harvest under the CE to less than 100,000 board feet or 10 acres. 3-ER-366–68 (54 Fed. Reg. 9,073 (March 3, 1989)).

### B. The Forest Service Adopted CE-6 as Part of a 1991/1992 Rulemaking Package that Was Overturned in Part.

In 1991, the Forest Service issued a proposed rule that included new and expanded CEs. 3-ER-352–55. In response to the environmental groups' petition, the Forest Service proposed breaking its "low-impact silvicultural activities" CE into separate, narrower categories. 3-ER-353. The Forest Service rejected the suggested 25,000-board-foot cap and instead proposed a cap of one million board feet or less for timber harvest or salvage. *Id.* The agency stated that it had "prepared environmental assessments on hundreds of timber sales which have these characteristics and ha[d] always found them to have no significant environmental effects." 3-ER-355.

The Forest Service's final rule reduced the scope of its proposed timber harvest CE ("CE-4"). 3-ER-347 (57 Fed. Reg. 43,180 (Sept. 18, 1992)). The agency ultimately adopted three categories of "low-impact silvicultural activities":

- CE-4, applicable to: Timber harvest which removes 250,000 board feet or less of merchantable wood products or salvage which removes 1,000,000 board feet or less of merchantable wood products; which requires one mile or less of low standard road construction; and assures regeneration of harvested or salvaged areas, where required.

- CE-5, now codified at 36 C.F.R. § 220.6(e)(5), applicable to: Regeneration of an area to native tree species, including site preparation which does not involve the use of herbicides or result in vegetation type conversion.

- CE-6, now codified at 36 C.F.R. § 220.6(e)(6), applicable to: Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction. Examples include, but are not limited to:

  o Girdling trees to create snags;
  o Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;
  o Prescribed burning to control understory hardwoods in stands of southern pine; and
  o Prescribed burning to reduce natural fuel build-up and improve plant vigor.

In 1999, a district court invalidated CE-4, which it ruled violated the requirement that categorically excluded actions have no significant environmental impacts. *Heartwood, Inc. v. U.S. Forest Serv.*, 73 F. Supp. 2d 962, 976 (S.D. Ill. 1999), *aff'd*, 230 F.3d 947 (7th Cir. 2000). As the court explained, the Forest Service had "not provide[d] any rationale for why this magnitude of timber sales would not have a significant effect on the environment." *Id.* at 975. The record contained no evidence to support the 250,000-board-feet limit beyond a reference to the agency's "expertise and prior experience with timber sales having 'these characteristics.'" *Id.* Instead, as the court noted, the record contained

recommendations from agency personnel that CE-4 be capped at 100,000 board feet. *Id.* at 976. The Forest Service had failed to address this recommendation and "to adequately address or provide support for its position that the timber harvests of [this] magnitude would not have cumulative effects on the environment." *Id.* The court therefore invalidated CE-4 and enjoined its use. *Id.* at 980.

The plaintiffs also brought a facial challenge to the process by which the new CEs were adopted, arguing that the Forest Service was obligated to prepare an EA or EIS for the rulemaking. The district court and the Seventh Circuit rejected this claim. *Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947 (7th Cir. 2000).

### C. The Forest Service Next Adopted New, Small-Scale Logging CEs.

On July 29, 2003, in response to *Heartwood*, the Forest Service adopted three new CEs applicable to small-scale logging projects. 2-ER-286 (68 Fed. Reg. 44,598, 44,599 (July 29, 2003)). The new categories were intended to be much more specific and "limited in scope" than the CE invalidated by *Heartwood.* 2-ER-305 (68 Fed. Reg. 1,026, 1,027 (Jan. 8, 2003).

- CE-12, now codified at 36 C.F.R. § 220.6(e)(12), allows harvest of live trees not to exceed 70 acres with no more than one-half mile of temporary road construction. Examples include thinning of overly dense stands of trees to improve the health and vigor of the remaining trees.

- CE-13, now codified at 36 C.F.R. § 220.6(e)(13), allows the salvage of dead and/or dying trees not to exceed 250 acres with no more than one-half mile of temporary road construction.

- CE-14, now codified at 36 C.F.R. § 220.6(e)(14), allows commercial and noncommercial felling and removal of any trees necessary to control the spread of insects and disease on no more than 250 acres with no more than one-half mile of temporary road construction.

The Forest Service explained that it now believed acreage to be a more useful measure than timber volume, which it had used to delimit the scope of CE-4. 2-ER-305. To develop acreage caps, the agency reviewed all 306 logging projects performed under CE-4 in 1998. 2-ER-306. The agency also randomly selected and reviewed 154 logging projects that were (1) approved under CE-4; (2) approved under an EA or EIS but fit within CE-4's requirements; or (3) otherwise small in scope. *Id.* These data were used to define the type and scale of actions that would not result in individually or cumulatively significant impacts.

On January 18, 2006, the Tenth Circuit rejected a facial challenge to CE-13. *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204 (10th Cir. 2006). Plaintiffs challenged both the Forest Service's methodology in establishing CE-13's 250-acre limit, and its conclusion that these projects would not have a significant impact. The court disagreed, holding that the Forest Service had adequately supported its decision in the record. *Id.* at 1216–22.

### D. The Forest Service Later Adopted Another Logging-Related CE but this Court Enjoined It.

In 2003, the Forest Service adopted "CE-10" for fuels reduction activities and post-fire rehabilitation projects. 2-ER-296 (68 Fed. Reg. 33,814 (June 5,

2003)). CE-10 allowed prescribed burning and both commercial and precommercial thinning. 2-ER-303. While the proposed rule had not imposed an acreage limitation, 2-ER-311–12 (67 Fed. Reg. 77,038, 77,040–41 (Dec. 16, 2002)), the final rule capped mechanical treatment projects at 1,000 acres and prescribed burns at 4,500 acres. 2-ER-303.

Plaintiffs challenged CE-10 on the grounds that, *inter alia*, it inappropriately included activities that have significant effects, and that the underlying data did not support CE-10's promulgation. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1021–22 (9th Cir. 2007). This Court agreed.

This Court determined that the Forest Service had failed to adequately assess the CE's potential significance. *Id.* at 1027–32. In particular, the Court flagged the absence of a "global cumulative impacts analysis," noting that the analysis was "of critical importance in a situation such as here, where the categorical exclusion is nationwide in scope and has the potential to impact a large number of acres." *Id.* at 1028. The record revealed a variety of "potential significant effects, such as effects on soil and water quality from mechanical treatments, thinning operations, fire rehabilitation activities, and temporary road construction," but the Forest Service arbitrarily concluded that effects would be "localized, temporary, and of minor magnitude." *Id.* at 1029. This Court vacated and enjoined the use of CE-10.

**E.     In 2020, the Forest Service Adopted a New CE Involving Commercial Logging and Determined It Must Be Capped at 2,800 Acres to Stay Below the Level of Significance.**

With the stated goal of "increasing efficiency of environmental analysis," on June 13, 2019, the Forest Service issued a proposed rule revising its NEPA regulations and adding several new CEs. 2-ER-220 (84 Fed. Reg 27,544 (June 13, 2019)). One proposed category, "CE-25," would cover "projects that include restoration activities to improve forest health and resiliency to disturbances and to improve terrestrial and aquatic habitat and other watershed conditions" on up to 7,300 acres, including up to 4,200 acres of "commercial or non-commercial timber harvest activities." 2-ER-224. The agency based the proposal on a random sample of 68 projects completed under EAs. *Id.*

The final rule, published in 2020, included a modified CE-25 (now codified at 36 C.F.R. § 220.6(e)(25)). 2-ER-201 (85 Fed. Reg. 73,620 (Nov. 19, 2020)). Based on a review conducted by agency scientists, the Forest Service dramatically reduced the size cap from 7,300 to 2,800 acres, which it found "better reflects the average size of projects from the sampled EAs, and also aligns with average acreages of specific activities in the sampled EA data set for which some commenters had concerns regarding the degree of impacts (such as commercial timber harvest)." *Id.*

### III. Application of CE-6

#### A. The Forest Service Historically Reviewed and Approved Larger-Scale Commercial Logging Projects Via EIS or EA, or Kept Commercial Logging Below the Logging CEs' Acreage Caps.

Under its regulatory regime, consistent with its repeated findings that commercial logging must be size-capped to ensure against significant environmental impacts, the Forest Service applied CE-6 only to noncommercial activities from 1992 until about 2018.

For example, the agency used CE-6 for a project involving 3,650 acres of noncommercial hand-trimming of one- to five-inch-diameter trees. *All. for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1122–23 (D. Mont. 2013) (describing proposal as the "most innocuous logging project to be challenged in this Court to date"); *Native Ecosystems Council v. Marten*, No. CV 17-77-M-DLC, 2018 U.S. Dist. LEXIS 208001, at *7–*11 (D. Mont. Dec. 10, 2018) (project involved noncommercial hand slashing and burning across approximately 12,000 acres). Noncommercial projects, involving activities such as precommercial thinning or prescribed burning, target small, non-merchantable trees. *See* 3-ER-362 (defining "precommercial thinning" as the "practice of removing some of the trees less than marketable size from a stand so that the remaining trees will grow faster").

In contrast, commercial logging projects, even with stated purposes related to "timber stand and/or wildlife habitat improvement," were authorized under an

EIS, EA, or an acreage-capped logging CE. For example, the Forest approved the

2006 Burnt Willow Project, which included 3,200 acres of commercial thinning,

after analysis in an EA. 2-ER-279. Its stated purposes included reducing excess

vegetation to increase tree vigor and health—in other words, "timber stand

improvement." 2-ER-277; *accord* 2-ER-246 (analyzing in EA project with

purposes including "reduc[ing] stand densities to improve vigor and increase

resilience to insects, disease, drought, and wildfire"); 2-ER-225–27 (same).

When the Forest Service did include commercial logging in a "timber stand

and/or wildlife habitat improvement" CE-6 project, it would apply an additional

CE to the commercial activities. For example, the Forest in 2006 approved a

project with both noncommercial and commercial activities under both CE-6 and

the now-defunct CE-10. 2-ER-280–82. Commercial salvage was approved under

CE-10, while strictly precommercial thinning and burning was approved under CE-

6. For further green-tree thinning activities which included both commercial and

noncommercial elements, the Forest invoked both CE-10 and CE-6. *Id.* Notably,

the entire project was limited to 990 acres—just below CE-10's 1,000-acre cap. *Id.*

Thus, the Forest appears to have deliberately **not** applied CE-6 to authorize

commercial thinning—otherwise, the invocation of CE-10 would have been

superfluous, as CE-6 is routinely used for noncommercial thinning on larger scales. *See Wild Rockies*, 979 F. Supp. 2d at 1122–23.[7]

On the very rare occasions when the Forest Service may have applied CE-6 to commercial logging, approved activities were small in scale. The Administrative Record contains a single example: a 2,280-acre "restoration thinning and prescribed fire project" in New Mexico, authorized in 2014 under CE-6. 2-ER-255–57. An indeterminate fraction of the project involved commercial harvest; its "focus" was thinning smaller trees. *See id.*

The historical use of EAs or EISs for larger logging operations reflects commercial logging's outsized environmental impacts. Commercial logging, relative to other vegetation management activities, has "several unavoidable adverse effects," 3-ER-359, including reduction of visual quality and adverse effects on water quality, soil, and wildlife habitat. *Id.*; *see also* 3-ER-329 (wildlife habitat fragmentation); 2-ER-322, (timber sales adversely affected 40% of the soil within the logging units); 2-ER-321–26 (significant hydrologic changes).

---

[7] *See also* 2-ER-241–243 (using CE-12 for 70 acres of commercial thinning to increase wildlife forage and reduce fuels); 2-ER-258–62 (using CE-12 for 67 acres of commercial thinning to "maintain[] * * * forest health, tree productivity, fuels hazard mitigation, and timber value").

Wild submitted these agency records as part of a request to take judicial notice, which the District Court denied. Wild challenges that denial in this appeal and renews its request in the concurrently filed motion. *See infra* pp. 58–60.

Commercial logging operations are conducted with heavy equipment and necessitate the creation of landings (where logs are temporarily stored) and skid trails (used to drag logs to landings). 3-ER-332; 3-ER-361–63. Transporting logs for processing requires substantial road construction and creates heavy traffic on forest roads, which increases erosion and water pollution. 3-ER-358; 2-ER-317–18; 3-ER-330–32. These effects do not typically result from noncommercial operations.

In sum, the Forest Service's historic use of EAs or EISs for larger logging projects flows from NEPA's basic requirements: Agencies must conduct a full environmental review where a project "may" have significant environmental impacts. And until recently, the Forest Service acknowledged large-scale commercial logging to have the potential for such impacts.

## B. The Forest Service Began Expanding the Use of CE-6 Around 2018.

Over the last four years, in keeping with a "mov[ement] towards shorter NEPA," 2-ER-206, the Forest Service started to apply CE-6 to commercial logging projects.

In 2018, President Trump instructed federal agencies to, *inter alia*, "[s]treamline agency administrative and regulatory processes and policies" by "using all applicable categorical exclusions." 2-ER-234–35. The Forest Service

duly began to emphasize "streamlining" NEPA and utilizing CEs whenever possible. *See* 2-ER-195, 203–06.

That year, the Los Padres National Forest in California invoked CE-6 for two fuel-reduction projects, which authorized up to 601 and 1,020 acres of commercial thinning, respectively. *See Mt. Cmtys.*, 25 F.4th at 673 (Cuddy project); *Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 661 (9th Cir. 2022) (Tecuya project); *see also* 2-ER-228–32, 237–40.

Environmental groups challenged both projects, arguing, *inter alia*, that the text of CE-6 does not encompass commercial logging because the term "thinning" as used in 36 C.F.R. § 220.6(e)(6)(ii) applies only to cutting small trees with no commercial value. *Mt. Cmtys.*, 25 F.4th at 674; *Los Padres*, 25 F.4th at 654, 661. This Court rejected the argument, ruling that CE-6 "does not limit activity by tree age or size" and thus "unambiguously allows the Forest Service to thin trees, including larger commercially viable ones, to reduce fire hazard." *Mt. Cmtys.*, 25 F.4th at 672, 677; *see also Los Padres*, 25 F.4th at 661 (adopting *Mountain Communities* analysis).[8]

*///*

---

[8] Plaintiffs here joined a coalition of organizations in filing amici briefs in support of petitions for *en banc* review of these decisions. The petitions were denied. Order, *Mt. Cmtys.*, 25 F.4th 667 (No. 20-55660) (June 21, 2022).

**C. In a Six-Month Timeframe, the Forest Approved Three Large-Scale Commercial Logging Projects Under CE-6.**

The Forest also began moving to "shorter NEPA." At the end of 2021, it invoked CE-6 for the Projects at issue here, whose commercial logging operations are significantly larger than those considered in *Mountain Communities* and *Los Padres*.

| Project | Scale of Commercial Thinning | Times Bigger than Cuddy (*Mtn. Cmtys.*) | Times Bigger than Tecuya (*Los Padres*) |
|---|---|---|---|
| Cuddy | 601 acres | -- | -- |
| Tecuya | 1,020 acres | 1.6 | -- |
| Baby Bear | 3,000 acres | 5 | 3 |
| Bear Wallow | 10,000 acres | 16 | 10 |
| South Warner | 16,000 acres | 26 | 16 |

To facilitate logging on the Projects, an indeterminate number of road miles will need to be reconstructed or repaired and then used for hauling operations. *See, e.g.*, 2-ER-149 (271.35 "proposed miles" of roads in the South Warner project area, not including temporary roads); 2-ER-160 (noting similar large-scale projects on the Forest have required over 20 miles of temporary road construction). Skid trails and landings—associated with extensive detrimental soil impacts, 2-ER-320–21—will be constructed and utilized across hundreds, if not thousands of acres. *See* 2-ER-187. None of these necessary features of **large-scale** commercial logging projects were addressed by this Court in *Mountain Communities*.

For each of the Projects, the Forest provided only a cursory "Scoping Notice," on which the single, abbreviated opportunity for public comment was based. *See* 2-ER-143–48, 182–85. These Notices are short, just three to four pages, and provide only rudimentary descriptions of the project location, purpose, and proposed activities. *See id.* There is little to no detail regarding the location and extent of project activities or their potential environmental impacts. *See id.* Although Baby Bear and Bear Wallow are adjacent, and all three Projects occur on the same Forest and were approved contemporaneously, the Forest did not analyze their cumulative impacts. *See* 2-ER-75–97, 112.[9]

Wild timely submitted comments, emphasizing that the Forest Service cannot, by law, approve projects of this scale using a CE because they entail too much commercial logging. 2-ER-98–111, 136–39, 142, 164–179.[10] The Forest Service provided no further public comment opportunities. *See* 2-ER-83, 94, 126.

Defendant Ramsey approved the South Warner Project on December 27, 2021. 2-ER-127. Defendant Wilson approved the Baby Bear and Bear Wallow Projects on May 6, 2022. 2-ER-84, 95. Defendants Ramsey and Wilson each

---

[9] *See* 40 C.F.R. § 1508.7 (defining "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[.]").

[10] Other commenters expressed similar concerns. *See, e.g.*, 2-ER-159–61 ("The South Warner Project is simply far too large and involves too much timber harvesting (and possibly too much road building) activity to qualify as a CE.").

determined that CE-6 applied to the Projects "because the proposed action addresses the need to improve wildlife habitat and timber stands and does not include the use of herbicides or authorize the construction of more than one mile of road construction." 2-ER-82, 93, 123. The Forest acknowledged that the Projects differed from similar past projects in that "NEPA will be accomplished with a CE instead of an EA." 2-ER-189; *see also* 2-ER-151 ("The Forest has been doing these types of projects at various scales for the last 20 years. Typically they used an EA or EIS[.]").

The issuance of the Decision Memoranda and decision not to prepare an EIS or EA constitute final agency action subject to judicial review. 5 U.S.C. § 706(2).

## V.     Proceedings Below

Wild commenced this action on July 12, 2022, challenging the approvals of the Projects and, in the alternative, CE-6 as applied to the Projects' commercial logging operations. 2-ER-37. On August 4, 2023, the District Court issued its opinion and order. 1-ER-10. On Wild's first claim, the District Court held that "CE-6 on its face permits commercial thinning for timber stand and wildlife habitat improvement and contains no acreage limit." 1-ER-22. The District Court purported to follow this Court's disposition in *Mountain Communities*. 1-ER-19–22.

The District Court did not reach the merits of Wild's second claim. Instead, it agreed with Defendants that the claim accrued in 1992 and was thus time-barred. 1-ER-25–26.[11] The District Court concluded that the "flaw" in Wild's argument "is that NEPA is a procedural statute." 1-ER-25. According to the District Court, Wild's claim alleging that the Forest Service exceeded its authority under NEPA "is necessarily a procedural claim," and, therefore, did not fall under this Court's precedent permitting "a substantive challenge to an agency decision alleging lack of agency authority" outside the statute of limitations. 1-ER-25–26.

The District Court denied in part Wild's Request for Judicial Notice: "Plaintiff's [sic] request as to exhibits 6–7 and 9 is denied because Plaintiffs failed to establish their relevance." 1-ER-11. These exhibits consisted of publicly available agency records comprising historical evidence of the Forest Service's use of CE-6 and other CEs for commercial logging activities. *See* 2-ER-241–43, 250–54, 258–62.

Wild timely filed its notice of appeal on August 28, 2023. 3-ER-383.

## SUMMARY OF THE ARGUMENT

If (1) CEs are, by definition and regulation, reserved for small, low-impact, and routine activities found to have no significant impacts, and (2) the Forest

---

[11] The District Court did not reach Defendants' alternative argument that Wild failed to "administratively exhaust this claim." 1-ER-23.

Service has found only that small, acreage-limited commercial logging operations have no significant impacts, how can the agency apply a CE to large-scale commercial logging operations on thousands of acres? It cannot, and this Court has two pathways to reach this conclusion.

**First**, under no reasonable interpretation can CE-6 cover projects of the type and scale authorized here, which involve from 3,000 to 16,000 acres of commercial logging. The text, structure, history, and purpose of CE-6 simply cannot support an interpretation that allows functionally unlimited commercial logging operations. In holding otherwise, the District Court relied on an over-expansive reading of *Mountain Communities* that ignores NEPA's statutory and regulatory context, in which **scale** is necessarily a limiting factor to ensure consistency with the definition and purpose of CEs.

**Second**, if CE-6 is interpreted to allow commercial logging of the scale authorized by the Projects, then CE-6 itself is unlawful as applied. When adopting CE-6, the Forest Service never determined that commercial logging operations would have no individually or cumulatively significant environmental impacts, as required under NEPA. Applying a CE to large-scale commercial logging operations is manifestly unreasonable and directly conflicts with NEPA. By exempting large-scale commercial logging operations from full environmental review, the Forest Service exceeded its authority.

The District Court never reached the merits of this challenge to CE-6 as applied, erroneously dismissing it as time-barred. Under the District Court's theory, however, this challenge never could have been brought. This Court's clear precedents prevent such an inequitable outcome. At the time of CE-6's adoption in 1992, no party—let alone Wild—could have challenged its application to large-scale commercial logging, as the Forest Service did not use CE-6 for such activities for nearly thirty years. Wild's substantive, as-applied challenge is timely.

## ARGUMENT

### I.   CE-6 Does Not Cover Commercial Logging Operations of this Type and Scale.

Extensive commercial logging operations of the type and scale authorized by the Projects—which authorize a collective total of 29,000 acres of commercial thinning, together with an indeterminate amount of roadwork and other logging activities—are inconsistent with CE-6. The Forest Service's reliance on CE-6 and failure to prepare EISs, or even less-intensive EAs, was arbitrary, capricious, and contrary to NEPA.

#### A.   Standard of Review

Issue 1 was ruled on below in an order granting summary judgment to Defendants. This Court reviews de novo a grant of summary judgment, applying the same standards that applied in the district court. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

This issue presents the question of whether a CE "covers a proposed action," *see* 40 C.F.R. § 1501.4 (2021), a question reviewed pursuant to the arbitrary and capricious standard of the APA, 5 U.S.C. § 706(2); *Alaska Ctr.*, 189 F.3d at 857. The agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In applying this standard of review, courts must conduct a "thorough, probing, in depth review." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971).

This issue turns on the interpretation of CE-6. Courts are not to reflexively defer to agency interpretations of their own regulations. *Kisor*, 139 S. Ct. at 2415. Instead, in interpreting a regulation, "a court must exhaust all the traditional tools of construction." *Id.* In undertaking this task, a court is to "carefully consider the text, structure, history, and purpose of a regulation." *Id.* As the Supreme Court instructed:

> If the law gives an answer—if there is only one reasonable construction of a regulation—then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense. Deference in that circumstance would permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.

*Id.* Even if "genuine ambiguity" remains after this inquiry, the agency's reading still must be "reasonable." This is a "requirement that an agency can fail," judged by similar analysis of the text, structure, history, and purpose. *Id.*

**B.    The Type—*and Scale*—of a Project Dictates Whether It Is Eligible for a CE.**

In determining whether the application of a CE "to the facts of the particular action" is arbitrary and capricious, *see California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002), courts consider two primary factors: type and scale. *See EPIC*, 968 F.3d at 990–91. Although *Mountain Communities* addresses type, it does not address scale. As to scale, *EPIC* is applicable because, unlike *Mountain Communities*, the project at issue in *EPIC* was an "extensive commercial logging project" akin to the Projects here.

Whether the **type** of project fits under a CE depends on the project's consistency with the plain language of the CE and/or whether it is similar in character to the examples provided. *See id.*; *see also Mtn. Cmtys.*, 25 F.4th at 676–78; *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 928 (9th Cir. 2000).

CE-6 applies to "timber stand and/or wildlife habitat improvement activities," with examples including "girdling trees to create snags," "thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand," and "prescribed burning." 36 C.F.R. § 220.6(e)(6)(i)–(iv). This Court in *Mountain Communities* concluded that "thinning" encompassed commercial as well as precommercial thinning.

The crux of *Mountain Communities* was whether "CE-6 limits timber stand improvement activities by **age or size of trees** (*i.e.*, whether CE-6 limits thinning

to only precommercial saplings)." 25 F.4th at 675 (emphasis added). This Court held that it did not: "the CE-6 exemption unambiguously allows the Forest Service to thin trees, including larger commercially viable ones * * * Its plain language does not limit thinning by tree age, size, or type[.]" *Id.* at 672.

But that does not end the inquiry for the much larger Projects at issue here. A project's **scale** is also determinative of whether it fits under a particular CE; otherwise, there is no way to ensure against significant impacts—the *sine qua non* of a CE. 40 C.F.R. § 1508.4. In some cases, scale is specified in the text of the CE itself. *See, e.g.*, CE-12, 36 C.F.R. § 220.6(e)(12) (harvest of live trees not to exceed 70 acres). For other CEs, scale must be implied, considering the type of activity. CE-6 falls into this latter category; contrary to the District Court's conclusion, just because CE-6 does not specifically define scale, that does not make project size immaterial.

This Court's caselaw confirms an implied size limitation on categorically excluded activities—and specifically on logging under CEs. In *EPIC*, the Forest Service attempted to use the CE for "road repair and maintenance"—CE(d)(4), 36 C.F.R. § 220.6(d)(4), which contains no acreage limitation—to commercially remove "hazard trees" along hundreds of miles of forest roads within the footprint of a recent fire. 968 F.3d at 988. This Court reasoned that "felling a dangerous dead or dying tree right next to the road" would be within the CE's scope, but not

an "**extensive commercial logging project**" that targeted trees "up to 200 feet away from either side of hundreds of miles of Forest Service roads" across 4,700 acres. 968 F.3d at 990 (emphasis added).

As district courts applying *EPIC* have concluded, it was the "type **and scale** of the project at issue in [*EPIC*] which prevented it from being authorized pursuant to [CE(d)(4)] and mandated further NEPA environmental analysis." *Forestkeeper v. U.S. Forest Serv.*, No. 1:21-cv-0141-DAD-BAM, 2021 U.S. Dist. LEXIS 192443, at *14 (E.D. Cal. Oct. 5, 2021) (emphasis added); *see also Cascadia Wildlands v. Warnack*, 570 F. Supp. 3d 983, 989 (D. Or. 2021) ("*EPIC* applies to the overall scale of the project[.]").

Likewise, in *West*, an agency authorized the use of CEs for certain unenumerated types of actions that fit the CEQ's overarching definition of "categorical exclusion" and were similar in character to enumerated examples. 206 F.3d at 928. The agency applied a CE to a new highway interchange project, arguing that it matched the example of "approvals for changes in access control." *Id.* Although the CE itself did not contain a size limitation, this Court considered the scale of the project, "an entirely new, $18.6 million, four-lane, fully directional interchange constructed over a former Superfund site and requiring 500,000 cubic yards of fill material, 30,000 tons of crushed surfacing, and 32,000 tons of asphalt concrete pavement." *Id.* According to this Court, the regulatory examples

suggested the agency "intends a very different scale of project to escape the more detailed environmental review that would occur in an [EA]." *Id.* Application of a CE was therefore inappropriate. *Id.*

A project's type **plus its scale** is thus the relevant equation for deciding whether it fits under a given CE. And as discussed in the following section, large-scale logging projects cannot fit within any reasonable interpretation of CE-6.

## C. The Text, Structure, History, and Purpose of CE-6 Demonstrate that It Does Not Cover Large-Scale Commercial Logging Operations.

Given their scale, the Projects here cannot fit under CE-6. This is confirmed by the letter and spirit of the Forest Service's CE regulatory regime and the overall purpose of CEs.

The District Court purported to resolve the scale question in view of the "plain language" of CE-6. 1-ER-19–22 (holding that the language of CE-6 "on its face" permits commercial logging of the scale authorized by the Projects). But this reading of CE-6 is too myopic; CE-6 itself is silent as to the question of scale, so resort to its "text, structure, history, and purpose" is necessary. *See Kisor*, 139 S. Ct. at 2415.

**First**, while the text of CE-6 is not dispositive as to scale, its examples are illuminative. The example relied on by this Court in *Mountain Communities* is "thinning" to open "an" existing road to "a" dense timber "stand." 36 C.F.R.

§ 220.6(e)(6)(ii). The use of the singular necessarily implies a smaller scale. By contrast, the tens of thousands of acres of commercial logging operations approved by the Projects will involve hundreds of miles of roads and hundreds, if not thousands of timber stands. *See* 2-ER-186 (discussing treatments in the 85,621-acre South Warner Project area). Large-scale commercial logging operations cannot be read to align with any of CE-6's narrowly drawn examples. *See West*, 206 F.3d at 928 (noting regulatory examples intended a "very different scale" than proposed project); *EPIC*, 968 F.3d at 990 (holding CE of limited scope cannot be applied to an extensive commercial logging project).

**Second**, the regulatory and statutory structure demonstrates that the scale of these Projects is inconsistent with CE-6. Authorizing 3,000, 10,000, and 16,000 acres of commercial logging activities, respectively, the Projects dwarf the agency's logging-related exclusions: CE-4 (250,000 board feet); CE-10 (1,000 acres); CE-12 (70 acres); CE-13 (250 acres); and CE-14 (250 acres). *See supra* pp. 12–19. While CE-25 and the statutory CEs authorize more acreage (between 2,800 and 4,500 acres), *see* 36 C.F.R. § 220.6(e)(25); 16 U.S.C. §§ 6591b–6591e, only Baby Bear is of a commensurate scale; Bear Wallow and South Warner are many times larger.

That is not to say that that the CEs are mutually exclusive; as this Court has held, "the Forest Service only needs to cite and rely on one CE, even if other CEs

may apply." *See Mt. Cmtys.*, 25 F.4th at 679–80. Rather, the regulatory structure provides helpful context. *See Norfolk Energy, Inc. v. Hodel*, 898 F.2d 1435, 1442 (9th Cir. 1990) ("In discerning the meaning of regulatory language, [a court's] task is to interpret the regulation as a whole, in light of the overall statutory and regulatory scheme, and not to give force to one phrase in isolation."). If all other CEs applicable to commercial logging are capped at relatively low acreages to ensure against significant impacts, it is unreasonable to interpret CE-6 to permit commercial logging of unlimited scale. *Cf. Maceren v. Dist. Dir., Immigration & Naturalization Serv.*, 509 F.2d 934, 941 (9th Cir. 1974) (courts should reject interpretations which produce an unjust, unreasonable, or absurd result).

**Third**, the regulatory history confirms that scale is a necessary condition of non-significance. CE-6 was adopted as part of a new regulatory regime to replace a CE for "low-impact silvicultural activities" that were "limited in size and duration," including, at the time, "thinning * * * of less than 100,000 board feet or less than 10 acres[.]" 3-ER-367. CE-4, promulgated in the same rulemaking, authorized green-tree logging up to 250,000 board feet or salvage logging up to 1,000,000 board feet. 3-ER-350. Between the proposed and final rule, the agency reduced the size of green-tree harvest to allay public concerns over negative environmental impacts. 3-ER-345. This history demonstrates that the Forest Service viewed project scale as a limiting factor.

It would be highly incongruous to interpret CE-6 to allow large-scale commercial logging projects, when, in the very same rulemaking, the Forest Service expressly determined that a cap of 250,000 board feet for green-tree logging was necessary to ensure against significant environmental impacts. For reference, Baby Bear—by far the **smallest** of the Projects—is projected to yield 10,940,798 board feet—nearly 44 times the live-tree harvest volume authorized under CE-4. 2-ER-141 (expressing estimated volume in "MBF," or 1,000 board feet).

**Finally**, the overall purpose of CEs forecloses an interpretation of CE-6 as permitting large-scale commercial logging operations. CEs are reserved for activities with minimal impacts. *EPIC*, 968 F.3d at 990. The genesis of CE-6 was the CE for "low impact silvicultural activities that are limited in size and duration[.]" 3-ER-353. Interpreting CE-6 to allow commercial logging operations of unlimited size and duration stands the CE regulatory regime on its head.

In holding otherwise, the District Court relied heavily on the Projects' stated restoration purposes. 1-ER-12–16. But NEPA is concerned with impacts, not intentions, and the agency's self-serving characterization of its actions is not a get-out-of-jail-free card. *See Bosworth*, 510 F.3d at 1029 (stating that NEPA analysis "cannot focus only on the beneficial effects of hazardous fuels management" but must analyze its overall environmental impact). As interpreted by the agency and

the District Court, the Forest Service could use CE-6 to avoid an EIS or EA for any commercial logging project of any scale, so long as the agency could claim it will incidentally benefit wildlife habitat—a result fundamentally incompatible with the limited function of CEs in the NEPA framework.

In sum, the regulatory text, structure, history, and purpose demonstrate that CE-6 plainly does not apply to commercial logging operations on the scale authorized by the Projects. For the same reasons, if CE-6 is "genuinely ambiguous" as to such large-scale operations, the Forest Service's interpretation is unreasonable. *See Kisor*, 139 S. Ct. at 2415–16 (agency's interpretation of an ambiguous regulation "must fall within the bounds of reasonable interpretation" as determined through a similar "text, structure, history, and purpose" analysis). Under no reasonable interpretation can CE-6 be read to cover large-scale commercial logging operations. The Projects' authorization of such activities must be held unlawful and set aside.

## II. Wild's As-Applied Challenge to CE-6 is Timely.

If this Court rules that CE-6 unambiguously allows commercial logging activities without regard to their scale, or concludes that CE-6 is ambiguous but defers to the Forest Service's interpretation that it does cover such activities, it must turn to Wild's as-applied challenge to CE-6 itself. Although CE-6 was adopted in 1992, the Forest Service did not apply it to large-scale commercial

logging in a manner that harmed Wild's interests until 2021–2022, when it took final agency action approving the Projects. Only then did Wild's right of action to challenge CE-6 as applied accrue, putting this challenge well within the statute of limitations.

The District Court held that Wild's claim accrued in 1992 and was thus time-barred. 1-ER-26. That ruling conflicts with this Court's precedents: *Wind River* and its progeny protect the ability to bring a substantive, as-applied challenge to an earlier decision alleged to be in excess of the agency's authority. 946 F.2d at 715–16. The District Court erroneously labeled Wild's claim "procedural" because the agency's authority and obligations stem from NEPA. But this misconstrues the nature of Wild's challenge. The *Wind River* doctrine encompasses specific **types of claims** regardless of the **type of statute** at issue.

## A.     Standard of Review

Issue 2 involves "the legal question of whether a statute of limitation applies," which this Court reviews de novo. *Nw. Envtl. Advocates. v. U.S. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008).

## B.     Claims that an Agency Exceeded Its Authority May Be Brought within Six Years of the Decision's Adverse Application.

"A substantive challenge to an agency decision alleging lack of agency authority may be brought within six years of the agency's application of that decision[.]" *Wind River*, 946 F.2d at 715–16. This doctrine has repeatedly been

confirmed by this Court. *See*, *e.g.*, *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1077 (9th Cir. 2016); *Sea Urchin*, 828 F.3d at 1051; *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 904 (9th Cir. 2012); *N. County Cmty. Alliance, Inc. v. Salazar*, 573 F.3d 738, 743 (9th Cir. 2009); *Nw. Envtl. Advocates*, 537 F.3d at 1019.[12]

*Wind River* involved an agency's 1979 establishment of "Wilderness Study Areas" ("WSAs"), withdrawing the land from mining. 946 F.2d at 711. Plaintiff mining company subsequently staked a mining claim within one WSA and, in 1986 and 1987, attempted to have the agency declare its decision establishing the WSA invalid because the area was not "roadless," as required by the underlying statute. *Id.* The agency rejected these challenges as untimely. *Id.* The plaintiff sued, arguing that the agency's 1979 decision was *ultra vires*. *Id.* at 712. The district court, too, dismissed the claim as untimely. This Court reversed. It explained:

> If * * * a challenger contests the substance of an agency decision as exceeding constitutional or statutory authority, the challenger may do so later than six years following the decision by filing a complaint for review of the adverse application of the decision to the particular challenger * * * The government should not be permitted to avoid all challenges to its actions, even if *ultra vires*, simply because the agency took the action long before anyone discovered the true state of affairs.

---

[12] Other circuits are in accord. *See Legal Envtl. Assistance Found.* v. *U.S. EPA* ("*LEAF*"), 118 F.3d 1467, 1472–73 (11th Cir. 1997); *NLRB Union v. Fed. Labor Relations Auth.*, 834 F.2d 191, 195–97 (1987).

*Id.* at 715–16; *see also Functional Music, Inc. v. FCC*, 274 F.2d 543, 546–47 (D.C. Cir. 1958) ("[L]imiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity[.]").

This Court has articulated a second, related rationale for the doctrine: some challenges are too abstract or too theoretical for meaningful litigation until long after the agency's improper action. *See Sea Urchin*, 828 F.3d at 1051–52. Before a decision's adverse application, any claims would be purely hypothetical, and a plaintiff "cannot be expected to anticipate all possible future challenges to a rule and bring them within six years of the rule's promulgation, before a later agency action applying the earlier rule leads to an injury." *Id.* at 1049–50.

In sum, *Wind River* protects a plaintiff's ability to challenge agency actions in excess of agency authority when those decisions later injure those plaintiffs. The doctrine prevents an agency from

> sidestep[ping] a legal challenge to one of its actions by backdating the action to when the agency first published an applicable or controlling rule. **If the operative dispute does not arise until decades later, when the agency applies the earlier rule, such a holding would wall off the agency from any challenge on the merits.**

*Sea Urchin*, 828 F.3d at 1051–52 (emphasis added).

///

///

## C.    *Wind River* Applies to Substantive Claims, Not Substantive Laws.

*Wind River* governs certain **types of claims** rather than **types of laws**—the
doctrine envisions a substantive challenge to a regulation, not a challenge to a
substantive regulation. *See Perez-Guzman*, 835 F.3d at 1087; *Cedars-Sinai Med.
Ctr.*, 177 F.3d at 1129 (holding procedural challenge to substantive rule untimely).
Contrary to the District Court's reductive framing, it does not matter that "NEPA is
a procedural statute," 1-ER-25, because Wild brings a substantive, as-applied
challenge, alleging that the Forest Service exceeded its authority to adopt CE-6.[13]

A procedural claim challenges "the manner in which the regulation was
adopted[.]" *Utu Utu Gwaitu Paiute Tribe of Benton Paiute Reserv. v. Dep't of
Interior*, 766 F. Supp. 842, 844 (E.D. Cal. 1991); *see also Nat. Res. Def. Council v.
Nuclear Regul. Comm'n*, 666 F.2d 595, 600–03 (D.C. Cir. 1981) (distinguishing
between timely substantive challenge to regulations as "unlawful because they
conflicted" with relevant statute and untimely procedural challenge based on
failure to provide notice and comment).

Procedural challenges generally are "facial," in that the procedural
irregularity invalidates the rule in every application. *See Bosworth*, 510 F.3d at

---

[13] NEPA is "procedural" insofar as it mandates agencies conduct
environmental review before making decisions, rather than "mandating particular
results." *Robertson*, 490 U.S. at 350. If an agency has properly conducted this
analysis, a court may not second-guess its ultimate decision. *See id.*

1024 (holding "procedural noncompliance" in adopting CE-10 rendered it "unlawful regardless of how [it was] applied"). Such claims do not require plaintiffs to "anticipate all possible future challenges to a rule." *Sea Urchin*, 828 F.3d at 1049–50. The violation occurs when the rule is promulgated, *see Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732 (1998), and procedural errors "will usually be apparent to any interested citizen" at that time. *Wind River*, 946 F.2d at 715. Consequently, *Wind River* does not apply to procedural claims, even those arising under substantive statutes.

In *Shiny Rock Min. Corp. v. United States*, this Court held that plaintiff mining company's challenge to a public land order withdrawing land from mining was time-barred. 906 F.2d 1362, 1364 (9th Cir. 1990). Faced with a similar disputed decision, this Court in *Wind River* distinguished *Shiny Rock* on the grounds that it had presented a procedural challenge (although brought under a substantive law) and had thus accrued when the agency first withdrew the land. 946 F.2d at 713; *see also Cedars-Sinai Med. Ctr.*, 177 F.3d at 1129 (holding untimely a challenge to a Medicare regulation alleging that the "agency followed the wrong procedures in announcing the new rule"); *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1301 (D. Alaska 1987) (complaint challenging EIS after more than six years was time-barred), *aff'd Sierra Club v. Penfold*, 857 F.2d 1307, 1310–11, 1315 (9th Cir. 1988).

For substantive challenges, in contrast, the "legality of the substance of the regulation is in issue." *Utu Utu Gwaitu Paiute*, 766 F. Supp. at 844. Such claims "will often require a more 'interested' person than generally will be found in the public at large" *Wind River*, 946 F.2d at 715. Indeed, such claims may not manifest until many years after the decision: Because not all applications of a rule may be unlawful, it could be lawfully applied for some time before a novel application revealed a substantive issue. *Sea Urchin*, 828 F.3d at 1049–50.

In applying *Wind River*, courts in this Circuit have sustained substantive, as-applied challenges even where the statute or rule was procedural. *See, e.g.*, *Harrosh v. Tahoe Regional Planning Agency*, 640 F. Supp. 3d 962, 976–78 (E.D. Cal. 2022) (plaintiff was "not challenging the procedure the Agency used when it adopted its rules of procedure," but arguing that "the Agency has created a voting procedure in conflict with the [statute]. * * * If someone had discovered this potential problem, it would have been theoretical before now"), *appeal dismissed*, No. 22-16759, 2022 WL 18638814 (9th Cir. Dec. 8, 2022); *Sequoia Forestkeeper v. Tidwell*, 847 F. Supp. 2d 1217, 1235–36 (E.D. Cal. 2012)[14] (challenge to Forest Service regulations excluding CE projects from notice and comment as "manifestly contrary to" statute which mandated notice and comment processes was timely);

---

[14] This opinion was vacated on grounds that the relevant statute was repealed. Order Granting Motion to Dismiss Appeal as Moot and Vacate Judgment Below, *Sequoia Forestkeeper v. Tidwell,* No. 12-16206 (9th Cir. March 7, 2014).

*Winter Wildlands All. v. U.S. Forest Serv.*, No. 1:11-CV-586-REB, 2013 U.S. Dist. LEXIS 47728 (D. Idaho Mar. 29, 2013) (challenge to agency rule exempting over-snow vehicles from required planning process was timely). In each case, the court properly ruled based on the nature of the plaintiffs' claim, rather than the nature of the governing statute.

### D. Wild's Substantive, As-Applied Challenge to CE-6 Is Timely.

The District Court mischaracterized Wild's claim as a complaint that the Forest Service violated the procedures for promulgating CEs. 1-ER-26. But Wild does not challenge the Forest Service's NEPA processes or procedures. Instead, Wild argues that by exempting large-scale commercial logging operations from review in an EA or EIS, CE-6 exceeds the Forest Service's authority. Wild's two-pronged claim is a substantive challenge to *ultra vires* agency action, brought within six years of the contested decision's application in a manner that harmed Wild's interests.

First, Wild argues that the Forest Service lacked the authority to adopt a CE without making the legally required determination that the covered activities would have no significant environmental impact. *See infra* pp. 53–56. Wild does not argue that the Forest Service violated the procedures it adopted to implement 40 C.F.R. § 1508.4, or that its application of the procedures was arbitrary or capricious; rather, it argues that the agency lacked the authority to adopt a CE for

large-scale commercial logging in the absence of the legally required determination that such activities have no significant impacts. 5 U.S.C. § 706(2)(C) (excess of authority).

This challenge mirrors that at issue in *North County*. There, in 1993, the agency approved an ordinance permitting gaming on tribal lands; in 2006, it approved construction of a casino pursuant to the ordinance. 573 F.3d at 741. Plaintiffs challenged the ordinance as applied to the later decision, arguing that "the agency was required to determine in 1993 the 'Indian lands' status of the parcel on which the Casino was built in 2006." *Id.* This Court held the challenge timely, reasoning that the agency was statutorily authorized to approve casinos **only** in areas it had determined were "Indian lands," but not on lands for which it had not made this finding. *Id.*; *see also Artichoke Joe's California Grand Casino v. Norton*, 278 F. Supp. 2d 1174, 1177–79 (E.D. Cal. 2003) (same); *cf. Wind River*, 946 F.2d at 711–12 (agency was empowered to designated WSAs only after determining area was roadless; challenge to the agency's alleged failure to make this required determination more than six years later was timely). Similarly, here, the Forest Service is empowered to create CEs—but **only** after determining that the relevant activities would have no significant effects. 40 C.F.R. § 1508.4.

Second, Wild challenges the Forest Service's interpretation of NEPA and 40 C.F.R. § 1508.4: because NEPA requires careful scrutiny and disclosure of any

action's environmental impacts to determine their significance, it is manifestly unreasonable to exempt commercial logging on the scale authorized by the Projects from full environmental review in the absence of any evidence that such activities have no significant impacts. 5 U.S.C. § 706(2)(C); *id.* 706(2)(A) (not in accordance with law).

This Court recognizes that a claim that an agency exceeded its authority by unreasonably interpreting an authorizing statute may be brought more than six years following the initial decision. For example, *Perez-Guzman* concerned rules "establish[ing] procedures for granting asylum." 835 F.3d at 1071. Twelve years after their promulgation, a plaintiff whose asylum application was denied based on these regulations challenged them as an "unreasonable interpretation" of the statute. *Id.* at 1077. As this represented a substantive challenge to the application of an earlier rule allegedly contradicting the agency's authority, this Court held it was not time-barred. *Id.*; *see also LEAF*, 118 F.3d at 1473 ("LEAF's contention that the regulations at issue in this case * * * are invalid because they are inconsistent with the [statute] constitutes a substantive challenge to these regulations.").

In sum, the *Wind River* doctrine protects a plaintiff's ability to bring substantive claims that the agency exceeded its authority—under any statute—that could not have been raised within six years of the challenged decision. "The government should not be permitted to avoid all challenges to its actions, even if

*ultra vires*, simply because the agency took the action long before anyone discovered the true state of affairs." *Wind River*, 946 F.2d at 715. The District Court's framing of Wild's challenge conflicts with this principle.

In 1992, Wild could not have sustained a challenge against CE-6 as applied to large-scale commercial logging operations, because no such application occurred for many years. *See Sea Urchin*, 828 F.3d at 1052 ("If parties had to challenge the [rule] within six years of 1987, then **any such challenge predating [its application] would necessarily have been theoretical**.") (emphasis added); *cf. Vieux v. East Bay Regional Park Dist.*, 893 F.2d 1558, 1573 (9th Cir. 1990) (court cannot issue "an opinion advising what the law would be upon a hypothetical state of facts").

The Forest Service could lawfully apply CE-6 to noncommercial activities with no significant impact—as it did for many years. It was not until CE-6 was actually applied to large-scale commercial logging operations in a manner that harmed Wild's interest that this challenge arose. *See Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1396 (9th Cir. 1986) (explaining cause of action accrues only when "the plaintiff is aware of the wrong and can successfully bring a cause of action"); *cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) (dismissing facial challenge to Forest Service rule because plaintiffs could show no application harming their interests); *Ohio Forestry*, 523

U.S. at 732 (dismissing facial challenge to forest plan as unripe because it had yet to be implemented). Thus, even if CE-6 unambiguously applies to large-scale commercial logging operations, Wild's right of action did not accrue until the Projects' approvals.

Similarly, if CE-6 upon its adoption was ambiguous as to such activities, then Wild's challenge did not accrue until the Forest Service offered its present interpretation, as applied in the Projects. *Cf. Nw. Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, (9th Cir. 2011) ("At the time an ambiguous regulation is promulgated[,] the public cannot reasonably be expected to challenge potential regulatory interpretations that are textually plausible but that the agency has not contemporaneously offered and may never adopt.") (citing Brief of the United States), *overruled on other grounds*, *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597 (2013).

In either case, if Wild cannot bring this challenge now, no such challenge ever could have been brought. The statute of limitations is not intended to function in such a manner—it "would cease to be a shield against stale claims, and would instead become a sword to vanquish a challenge like the case here, without ever considering the merits." *Sea Urchin*, 828 F.3d at 1051–52. To prevent such an inequitable outcome, this Court should hold that Wild's challenge is timely.

///

## III. If CE-6 Permits the Projects' Commercial Logging Operations, the Forest Service Exceeded Its Authority in Adopting CE-6.

If this Court holds that Wild's as-applied challenge is timely, it should reach Issue 3. Under NEPA and its implementing regulations, agencies are authorized to adopt CEs for certain classes of activities—but **only** after first determining that such activities have no significant impact. The Forest Service never made this required determination for large-scale commercial logging operations; exempting those activities from full environmental review in an EA or EIS is thus unreasonable and flatly contradicts NEPA. The Forest Service exceeded its authority by applying CE-6 to large-scale commercial logging projects.

### A. Standard of Review

Although the District Court never reached the merits of this issue, this Court should. To determine whether an agency has exceeded its authority, courts must look first to the plain meaning of the controlling statute. *Nw. Envtl. Advocates*, 537 F.3d at 1020–21 (citing *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43 (1984)). Questions of statutory and regulatory interpretation are reviewed de novo. *See id.*

"An appellate court need not wait when a question could not possibly be affected by deference to a trial court's factfinding or fact application, or a litigant's further development of the factual record." *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100,

1111 (9th Cir. 2020). Here, the administrative record is complete and no factual development is needed, or could occur.

Wild brings purely legal questions, "and the district court has no comparative advantage in reviewing agency action" under the APA. *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 n.* (D.C. Cir. 2012); *see also Donovan v. Crisostomo*, 689 F.2d 869, 874 (9th Cir. 1982) ("[A] Court of Appeals may consider an issue raised in the trial court but not considered, especially when the issue involves legal and not factual considerations."). It is therefore appropriate for the Court to address the merits of Issue 3 now.

## B. The Forest Service Exceeded Its Authority in Applying CE-6 to Large-Scale Commercial Logging Operations.

By exempting commercial logging on the scale of the Projects from full NEPA review, CE-6 exceeds the scope of the Forest Service's authority, for two reasons.

First, only classes of activities an agency has *ex ante* "found" will have no significant effect, individually or cumulatively, may be excluded from analysis in an EA or EIS. 40 C.F.R. § 1508.4; *Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1179 (9th Cir. 2022) ("By definition, CE's are categories of actions that have been predetermined not to involve significant environmental impacts[.]"). In adopting CE-6, however, the Forest Service never made the legally required determination that large-scale commercial logging operations of the type and scale approved by

the Projects have no significant impact. The Forest Service, therefore, lacked the authority to adopt CE-6 for such activities.

Second, an agency's fundamental duty under NEPA is to analyze and disclose the environmental impacts of its actions and determine their potential significance. *See Robertson*, 490 U.S. at 349–50; 42 U.S.C. § 4332(2)(C). The Forest Service's unreasonable interpretation of "no significant impact" to encompass large-scale logging circumvented this core requirement; the application of CE-6 to the Projects directly conflicts with NEPA's text and purpose and is *ultra vires*.

In the proceedings below, Defendants did not advance a defense of CE-6 as applied. Any such defense would have been futile: large-scale commercial logging operations are plainly incompatible with any reasonable interpretation of non-significance.[15]

---

[15] The District Court did not reach Defendants' argument that Wild failed to adequately exhaust its administrative remedies as to this claim. 1-ER-23. To the extent that Appellants renew this argument, this Court should reject it because (1) Wild and other commenters adequately communicated their fundamental concern that CE-6 was legally inappropriate under NEPA for commercial logging, particularly on this scale, *see* 2-ER-101–04, 136–38, 142; and (2) the Forest Service was independently aware of the issue. *See* 2-ER-194–95, 205–09 The agency was sufficiently on notice of this issue under this Court's precedents. *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002). Moreover, greater detail would have served no purpose, as the agency could not retroactively bolster its 1992 rulemaking. *See Johnson v. Shalala*, 2 F.3d 918, 922 (9th Cir. 1993) (holding exhaustion unnecessary where "nothing is gained from permitting the compilation of a detailed factual record, or from agency expertise").

### 1. The Forest Service Lacked the Authority to Adopt a CE for Large-Scale Commercial Logging Operations.

NEPA authorizes agencies to adopt CEs only under certain conditions set forth in the CEQ regulations. 40 C.F.R. § 1507.3(b)(2)(ii). The excluded actions must "**have been found** to have no [significant] effect[.]" *Id.* § 1508.4 (emphasis added). In other words, agencies are authorized to adopt CEs **only** where this prerequisite determination has been made.[16]

The Forest Service adopted CE-6 as part of a package of CEs designed to replace the previous "low impact silvicultural activities" CE. *See supra* pp. 12–15. Nowhere in that rulemaking did the agency find that commercial logging under CE-6 would have no significant impact. 3-ER-342–56. Instead, the agency discussed commercial logging only in the limited context of CE-4, which permitted commercial timber harvest of up to 250,000 board feet requiring one mile or less of road construction. Not a single reference was made to commercial logging under CE-6, nor to **large-scale** commercial logging operations under any CE.

On review of CE-4, the *Heartwood* court specifically noted the lack of any evidence in the record to support the increase from the prior 100,000-board-foot limit, other than oblique references to agency "expertise and prior experience," and

---

[16] The CEQ regulations, which define NEPA's terms and set forth the specific requirements for compliance with the statute, are "mandatory and binding on federal agencies." *Steamboaters v. FERC*, 759 F.2d 1382, 1393 n.4 (9th Cir. 1985); *See Churchill County v. Norton*, 276 F.3d 1060, 1072 n.7 (9th Cir. 2001).

found that the "increase [to 250,000 board feet] in the harvest limit for live trees is a classic example of an arbitrary decision." 73 F. Supp. 2d at 976. That same record necessarily lacks a basis for the Forest Service to categorically exclude commercial logging on a much larger scale under CE-6.

The present case underscores the importance of this prerequisite finding to NEPA's implementation. For one glaring example, the Forest did not analyze the Projects' cumulative effects, although they overlap geographically and temporally. *See* 2-ER-75–97. The rationale behind CEs is that this analysis has already occurred at the rulemaking stage, where the agency must find that the relevant activities will have no individual **or cumulative** impact. 40 C.F.R. § 1508.4. But no such analysis ever occurred for large-scale commercial logging. *See supra* pp. 12–16. The application of CE-6 to the Projects thus allows them to forever evade this review. 40 C.F.R. §§ 1508.7, 1508.25; 2-ER-192 (falsely claiming that the cumulative effects analysis already occurred at the rulemaking stage).

The Forest Service never made—and could not lawfully have made—the required finding under 40 C.F.R. § 1508.4 that large-scale commercial logging under CE-6 would cause no individually or cumulatively significant impacts. The Forest Service therefore exceeded its authority by adopting CE-6 and applying it to the commercial logging authorized by the Projects. *Cf. Planned Parenthood*, 946 F.3d at 1113 (agency rule conflicted with statutory prerequisite requirements for

adopting rule) *NRDC v. U.S. EPA*, 857 F.3d 1030, 1039–42 (9th Cir. 2017)

(vacating decision because agency failed to support statutorily required finding).

<strong>2. The Forest Service's Interpretation of NEPA and 40 C.F.R. § 1508.4 as Permitting Large Scale Commercial Logging Flatly Contradicts NEPA's Text and Purpose</strong>

CE-6's exemption of large-scale commercial logging operations from full

environmental review is contrary to NEPA and the CEQ regulations. Such

exemption necessarily means that the Forest Service interprets "actions which do

not individually or cumulatively have a significant effect on the human

environment" to encompass commercial logging of functionally limitless scale. 40

C.F.R. § 1508.4; *see also* 42 U.S.C. § 4332(2)(C) (EIS required for actions that

have significantly effects). This interpretation is manifestly unreasonable, for at

least three reasons.[17]

**First**, NEPA ensures that agencies carefully disclose and consider all

potentially significant environmental impacts of their actions, to foster informed

decisionmaking, and facilitate meaningful public involvement. *Dep't of Transp. v.

Pub. Citizen*, 541 U.S. 752, 768 (2004). Agencies may conduct this analysis and

---

[17] The Forest Service's interpretation of NEPA and the CEQ regulations is due no deference. Congress delegated the authority singularly to the CEQ to interpret and implement NEPA, 42 U.S.C. §§ 4342, 4344(4); courts therefore need not defer to other agencies' interpretation of NEPA or the CEQ regulations. *See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 738 (D.C. Cir. 2019)

disclosure *ex ante* for an entire class of actions—during a CE rulemaking—but this examination never occurred for commercial logging under CE-6. *See supra* pp. 12–16. As applied to these activities, CE-6 is therefore in direct conflict with NEPA and the plain text of 40 C.F.R. § 1508.4; *cf. LEAF*, 118 F.3d at 1473 ("A regulation which * * * operates to create a rule out of harmony with the statute[] is a mere nullity.") (citing *Dixon v. United States*, 381 U.S. 68, 74 (1965)).

**Second**, that Congress itself has found it necessary to impose strict size limitations on logging-related CEs is objective indicia that limitless commercial logging simply cannot be squared with NEPA. 16 U.S.C. § 6591 (capped at 3,000 to 4,500 acres). The statutory CEs address insects and disease, hazardous fuels, and wildlife habitat—many of the Projects' intended purposes. *Id.*; 2-ER-75–76, 87–88, 113–15. Application of CE-6 in the manner approved by the Projects is an end-run around Congress. *Cf. United States v. LKAV*, 712 F.3d 436 (9th Cir. 2013) (to aid the inquiry of statutory construction, courts may look to "the language of related or similar statutes.").

**Third**, the Forest Service has consistently found that strict size limits on commercial logging projects are necessary to ensure against significant impacts, and reviewing courts have vigilantly policed these findings. *See supra* pp. 12–19. And for years, the agency employed EAs or EISs for any commercial logging project that went beyond the acreage limits of the logging CEs. *See supra* pp. 20–

23. Applying CE-6 to large-scale commercial logging operations conflicts with the agency's own long-standing interpretation of NEPA significance—additional evidence that the Forest Service's interpretation of significance in the context of CE-6 is manifestly unreasonable. *Cf. Watt v. Alaska*, 451 U.S. 259, 273 (1981) (rejecting interpretation that conflicted with long-held position).

The practical effect of the Forest Service's use of CE-6 here is that 29,000 acres of commercial logging—authorized by the same Forest over a six-month timespan—was approved without the aid of detailed analysis and disclosure of environmental impacts **at any stage**. CE-6, as-applied to the Projects' commercial logging operations, fundamentally conflicts with NEPA and is thus *ultra vires*. *Cf. Nw. Envtl. Advocates.*, 537 F.3d at 1020–22 (holding agency rule *ultra vires* because it conflicted with statutory language and purpose).

## IV. The District Court's Denial of Wild's Request to Take Judicial Notice Should Be Reversed.

Wild requested that the District Court take judicial notice of several Forest Service NEPA records from projects on National Forests in Oregon authorized under CE-6 and other CEs. These documents are appropriate for judicial notice; the District Court abused its discretion in refusing to admit the records.

///

///

## A.    Standard of Review

A district court's denial of a request for judicial notice is reviewed for abuse

of discretion. *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 998 (9th Cir.

2018).

## B.    The District Court Abused Its Discretion in Denying the Request to Take Judicial Notice.

Under Federal Rule of Evidence 201(b), a court "may judicially notice a fact

that is not subject to reasonable dispute because it * * * can be accurately and

readily determined from sources whose accuracy cannot reasonably be

questioned." Publicly available government records on government websites are

presumptively noticeable, as their existence and contents are "not subject to

reasonable dispute." *See Northstar Fin. Advisors, Inc. v. Schwab Invs*., 779 F.3d

1036, 1043 (9th Cir. 2015). This Court routinely takes judicial notice of agency

NEPA documents. *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092,

1112 n. 14 (9th Cir. 2010) (taking judicial notice of agency NEPA documents);

*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Rec.*, 655 F.3d 1000, 1010 n.5 (9th

Cir. 2011) (same).

The District Court did not dispute the existence or accuracy of the

documents, but merely stated that "Plaintiffs failed to establish their relevance." 1-

ER-11. This was an abuse of discretion, because the "relevance" of the records

goes to the weight they should be accorded—not their admissibility. *See Padilla v.*

*City of Richmond*, 509 F. Supp. 3d 1168, 1182 (N.D. Cal. 2020) ("Whether or not the [document] is persuasive * * * is a matter entirely separate from whether it is judicially noticeable.").

Alternatively, because the District Court made no specific findings, Wild renews its request for judicial notice in this Court in the concurrently filed motion.

## V.    Relief

Wild respectfully requests this Court to hold unlawful and set aside the decisions approving the Projects' commercial logging operations and, if this Court reaches Issue 3, declare CE-6 unlawful as applied to commercial logging operations of the scale authorized by the Projects. *See* 5 U.S.C. § 706(2). Vacatur is the presumptive remedy for APA violations. *See Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) ("[W]e have only ordered remand without vacatur in limited circumstances[.]").

To rebut the presumptive remedy of vacatur, the burden is on the agency to show that (1) its errors are not serious, and (2) there would be disruptive consequences of an interim change that may itself be changed. *Id.* (quoting *Allied Signal, Inc. v. U.S. NRC*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). The Forest Service cannot make the required showings here.

First, the agency's errors are serious. *See Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) (vacating "inadequate EA, which

is the presumptive remedy for agency action that violates NEPA as reviewed through the APA"). Second, the consequences of vacatur would not be "severe"—vacatur would merely preserve the status quo. *See Cal. Cmtys.*, 688 F.3d at 992, 994 (identifying the wiping out of a species of snail and endangerment of an entire region's power supply as "severe" consequences). The Forest Service would merely be required to fully analyze the environmental impacts of large-scale commercial logging—as it consistently did for decades.

## CONCLUSION

For all of the foregoing reasons, Wild respectfully asks this Court to reverse the judgment of the District Court and hold unlawful and set aside the Projects' commercial logging operations—or, in the alternative, declare CE-6 unlawful as applied to such commercial logging operations—and remand to the agency to comply with NEPA.

DATED this 6th day of December 2023.

///

///

///

///

///

///

Respectfully submitted,

s/ Oliver J. H. Stiefel
Oliver J. H. Stiefel, OSB # 135436
503-227-2212 │ oliver@crag.org
Meriel L. Darzen, OSB # 113645
503-525-2725 │ meriel@crag.org
Crag Law Center
3141 E. Burnside St.
Portland, OR 97214

Erin E. Hogan-Freemole, OSB # 212850
971-417-6851 │ ehoganfreemole@wildearthguardians.org
WildEarth Guardians
213 SW Ash Street, Suite 202
Portland, OR 97204

*Attorneys for Plaintiffs-Appellants*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | No. 23-35579

I am the attorney or self-represented party.

**This brief contains** | 13,999 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [               ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Erin E. Hogan-Freemole | **Date** | 12/06/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

I

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Oregon Wild and WildEarth

Guardians certify that there are no related cases.

**CERTIFICATE OF SERVICE**

I hereby certify that on December 6, 2023, a copy of the foregoing

APPELLANTS' OPENING BRIEF was served electronically on the Federal

Defendants – Appellees via CM/ECF.


s/ Oliver J. H. Stiefel

Oliver J. H. Stiefel
Crag Law Center

*Of Attorneys for Oregon Wild and WildEarth Guardians*

# ADDENDUM

# TABLE OF CONTENTS

STATUTES

ADMINISTRATIVE PROCEDURE ACT
5 U.S.C. § 706 – Scope of review ..................................................................III

HEALTHY FOREST ACT
16 U.S.C. § 6591b – Administrative review ................................................... IV

JUDICIAL CODE AND JUDICIARY
28 U.S.C. § 2401 – Time for commencing action against United States ....... VI

NATIONAL ENVIRONMENTAL POLICY ACT
42 U.S.C. § 4321 – Congressional declaration of purpose ............................ VII
42 U.S.C. § 4332 – Cooperation of agencies; reports; availability of
information; recommendations; international and national coordination
of efforts .................................................................................................. VII

REGULATIONS

FOREST SERVICE CATEGORICAL EXCLUSIONS
36 C.F.R. § 220.6 – Categorical Exclusions..................................................... IX

COUNCIL ON ENVIRONMENTAL QUALITY REGULATIONS (2019)
40 C.F.R. § 1500.1 – Purpose........................................................................XIII
40 C.F.R. § 1501.4 – Whether to prepare an environmental impact
statement................................................................................................XIII
40 C.F.R. § 1507.1 – Compliance .................................................................XIV
40 C.F.R. § 1507.3 – Agency procedures......................................................XIV
40 C.F.R. § 1508.4 – Categorical exclusion...................................................XV
40 C.F.R. § 1508.7 – Cumulative impact.......................................................XV
40 C.F.R. § 1508.8 – Effects .........................................................................XV
40 C.F.R. § 1508.9 – Environmental assessment .........................................XVI
40 C.F.R. § 1508.25 – Scope.........................................................................XVI
40 C.F.R. § 1508.27 – Significantly............................................................ XVII

COUNCIL ON ENVIRONMENTAL QUALITY REGULATIONS (2021)
    40 C.F.R. § 1501.5 – Categorical Exclusions.................................................XIX

OTHER AUTHORITIES

  FEDERAL RULES OF EVIDENCE
    Rule 201 – Judicial Notice of Adjudicative Facts ..........................................XX

  FOREST SERVICE HANDBOOK
    FSH 1909.15 § 31.2 (1992) – Categories of Actions for Which a
      Project or Case File and Decision Memo Are Required .........................XXI
    FSH 1909.15 § 31.2(10) (2004) ...................................................................XXI

# Statutes

## ADMINISTRATIVE PROCEDURE ACT

### 5 U.S.C. § 706 – Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B) contrary to constitutional right, power, privilege, or immunity;

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D) without observance of procedure required by law;

    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

# HEALTHY FOREST ACT

**16 U.S.C. § 6591b – Administrative review**
(a) In general
   Except as provided in subsection (d), a project described in subsection (b) that
   is conducted in accordance with section 6591a(d) of this title may be--
   (1) considered an action categorically excluded from the requirements of
      Public Law 91-190 (42 U.S.C. 4321 et seq.); and
   (2) exempt from the special administrative review process under section 6515
      of this title.
(b) Collaborative restoration project
   (1) In general
      A project referred to in subsection (a) is a project to carry out forest
      restoration treatments that—
      (A) maximizes the retention of old-growth and large trees, as appropriate
         for the forest type, to the extent that the trees promote stands that are
         resilient to insects and disease;
      (B) considers the best available scientific information to maintain or
         restore the ecological integrity, including maintaining or restoring
         structure, function, composition, and connectivity; and
      (C) is developed and implemented through a collaborative process[.]

* * *

(c) Limitations
   (1) Project size
      A project under this section may not exceed 3,000 acres.
   (2) Location
      A project under this section shall be limited to areas—
      (A) in the wildland-urban interface; or
      (B) Condition Classes 2 or 3 in Fire Regime Groups I, II, or III, outside the
         wildland-urban interface.
   (3) Roads
      (A) Permanent roads
         (i)   Prohibition on establishment
               A project under this section shall not include the establishment
               of permanent roads.
         (ii)  Existing roads
               The Secretary may carry out necessary maintenance and repairs
               on existing permanent roads for the purposes of this section.
      (B) Temporary roads

The Secretary shall decommission any temporary road constructed under a project under this section not later than 3 years after the date on which the project is completed.

# JUDICIAL CODE AND JUDICIARY

**28 U.S.C. § 2401 – Time for commencing action against United States**

(a) Except as provided by chapter 71 of title 41, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.

# NATIONAL ENVIRONMENTAL POLICY ACT

**42 U.S.C. § 4321 – Congressional declaration of purpose**
The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

**42 U.S.C. § 4332 – Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts**
The Congress authorizes and directs that, to the fullest extent possible:

(1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and

(2) all agencies of the Federal Government shall—

    (A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

    (B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

    (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

        (i) the environmental impact of the proposed action,

        (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

        (iii) alternatives to the proposed action,

        (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v)     any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes[.]

# Regulations

## FOREST SERVICE CATEGORICAL EXCLUSIONS

### 36 C.F.R. § 220.6 – Categorical Exclusions

(a) General. A proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action and if:

  (1) The proposed action is within one of the categories established by the Secretary at 7 CFR part 1b.3; or

  (2) The proposed action is within a category listed in § 220.6(d) and (e).

(b) Resource conditions.

  (1) Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS are:

    (i)    Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;

    (ii)   Flood plains, wetlands, or municipal watersheds;

    (iii)  Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;

    (iv)  Inventoried roadless area or potential wilderness area;

    (v)   Research natural areas;

    (vi)  American Indians and Alaska Native religious or cultural sites; and

    (vii)  Archaeological sites, or historic properties or areas.

  (2) The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion (CE). It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist.

(c) Scoping. If the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA. If the responsible official determines, based on scoping, that the proposed action may have a significant environmental effect, prepare an EIS.

(d) Categories of actions for which a project or case file and decision memo are not required. A supporting record and a decision memo are not required, but at the discretion of the responsible official, may be prepared for the following categories:

* * *

(3) Repair and maintenance of administrative sites. Examples include but are not limited to:

    (i)      Mowing lawns at a district office;

* * *

(4) Repair and maintenance of roads, trails, and landline boundaries. Examples include but are not limited to:

    (i)      Authorizing a user to grade, resurface, and clean the culverts of an established NFS road;

    (ii)      Grading a road and clearing the roadside of brush without the use of herbicides;

    (iii)      Resurfacing a road to its original condition;

    (iv)      Pruning vegetation and cleaning culverts along a trail and grooming the surface of the trail; and

    (v)      Surveying, painting, and posting landline boundaries.

* * *

(e) Categories of actions for which a project or case file and decision memo are required. A supporting record is required and the decision to proceed must be documented in a decision memo for the categories of action in paragraphs (e)(1) through (25) of this section. As a minimum, the project or case file should include any records prepared, such as: The names of interested and affected people, groups, and agencies contacted; the determination that no extraordinary circumstances exist; a copy of the decision memo; and a list of the people notified of the decision. If the proposed action is approval of a land management plan, plan amendment, or plan revision, the plan approval document required by 36 CFR part 219 satisfies the decision memo requirements of this section.

* * *

(6) Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction. Examples include, but are not limited to:

    (i)      Girdling trees to create snags;

    (ii)      Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;

       (iii)    Prescribed burning to control understory hardwoods in stands of southern pine; and

       (iv)    Prescribed burning to reduce natural fuel build-up and improve plant vigor.

\* \* \*

(12)     Harvest of live trees not to exceed 70 acres, requiring no more than ½ mile of temporary road construction. Do not use this category for even-aged regeneration harvest or vegetation type conversion. The proposed action may include incidental removal of trees for landings, skid trails, and road clearing. Examples include, but are not limited to:

     (i)    Removal of individual trees for sawlogs, specialty products, or fuelwood, and

     (ii)    Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and vigor.

(13)     Salvage of dead and/or dying trees not to exceed 250 acres, requiring no more than ½ mile of temporary road construction. The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include, but are not limited to:

     (i)    Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road to access the damaged trees, and

     (ii)    Harvest of fire-damaged trees.

(14)     Commercial and non-commercial sanitation harvest of trees to control insects or disease not to exceed 250 acres, requiring no more than ½ mile of temporary road construction, including removal of infested/infected trees and adjacent live uninfested/uninfected trees as determined necessary to control the spread of insects or disease. The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include, but are not limited to:

     (i)    Felling and harvest of trees infested with southern pine beetles and immediately adjacent uninfested trees to control expanding spot infestations, and

     (ii)    Removal and/or destruction of infested trees affected by a new exotic insect or disease[.]

\* \* \*

(25)     Forest and grassland management activities with a primary purpose of meeting restoration objectives or increasing resilience. Activities to

improve ecosystem health, resilience, and other watershed and habitat conditions may not exceed 2,800 acres.

(i)    Activities to meet restoration and resilience objectives may include, but are not limited to:

* * *

(G) Vegetation thinning; and

(H) Timber harvesting.

(ii)    The following requirements or limitations apply to this category:

(A) Projects shall be developed or refined through a collaborative process that includes multiple interested persons representing diverse interests;

(B) Vegetation thinning or timber harvesting activities shall be designed to achieve ecological restoration objectives, but shall not include salvage harvesting as defined in Agency policy; and

(C) Construction and reconstruction of permanent roads is limited to 0.5 miles. Construction of temporary roads is limited to 2.5 miles, and all temporary roads shall be decommissioned no later than 3 years after the date the project is completed. Projects may include repair and maintenance of NFS roads and trails to prevent or address resource impacts; repair and maintenance of NFS roads and trails is not subject to the above mileage limits.

# COUNCIL ON ENVIRONMENTAL QUALITY REGULATIONS (2019)

## 40 C.F.R. § 1500.1 – Purpose

(a) The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b) NEPA procedures must insure [sic] that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

## 40 C.F.R. § 1501.4 – Whether to prepare an environmental impact statement

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in §1507.3) whether the proposal is one which:
  (1) Normally requires an environmental impact statement, or
  (2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(l).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

\* \* \*

## 40 C.F.R. § 1507.1 – Compliance

All agencies of the Federal Government shall comply with these regulations. It is the intent of these regulations to allow each agency flexibility in adapting its implementing procedures authorized by §1507.3 to the requirements of other applicable laws.

## 40 C.F.R. § 1507.3 – Agency procedures

(a) Not later than eight months after publication of these regulations as finally adopted in the Federal Register, or five months after the establishment of an agency, whichever shall come later, each agency shall as necessary adopt procedures to supplement these regulations. When the agency is a department, major subunits are encouraged (with the consent of the department) to adopt their own procedures. Such procedures shall not paraphrase these regulations. They shall confine themselves to implementing procedures. Each agency shall consult with the Council while developing its procedures and before publishing them in the Federal Register for comment.

\* \* \*

(b) Agency procedures shall comply with these regulations except where compliance would be inconsistent with statutory requirements and shall include:

(1) Those procedures required by §§1501.2(d), 1502.9(c)(3), 1505.1, 1506.6(e), and 1508.4.

(2) Specific criteria for and identification of those typical classes of action:

    (i)    Which normally do require environmental impact statements.

    (ii)    Which normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (§ 1508.4)).

    (iii)    Which normally require environmental assessments but not necessarily environmental impact statements.

\* \* \*

**40 C.F.R. § 1508.4 – Categorical exclusion**

*Categorical exclusion* means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

**40 C.F.R. § 1508.7 – Cumulative impact**

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**40 C.F.R. § 1508.8 – Effects**

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

**40 C.F.R. § 1508.9 – Environmental assessment**

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

   (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

   (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

   (3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.


**40 C.F.R. § 1508.25 – Scope**

*Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

   (1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

      (i)    Automatically trigger other actions which may require environmental impact statements.

      (ii)   Cannot or will not proceed unless other actions are taken previously or simultaneously.

      (iii)  Are interdependent parts of a larger action and depend on the larger action for their justification.

   (2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

   (3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:
    (1) No action alternative.
    (2) Other reasonable courses of actions.
    (3) Mitigation measures (not in the proposed action).
(c) Impacts, which may be:
    (1) Direct;
    (2) indirect;
    (3) cumulative.

## 40 C.F.R. § 1508.27 – Significantly

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) *Context*. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity*. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

    (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

    (2) The degree to which the proposed action affects public health or safety.

    (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

    (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

    (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

    (6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

    (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10)  Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

# COUNCIL ON ENVIRONMENTAL QUALITY REGULATIONS (2021)

**40 C.F.R. § 1501.5 – Categorical Exclusions**
(a) For efficiency, agencies shall identify in their agency NEPA procedures
(§ 1507.3(e)(2)(ii) of this chapter) categories of actions that normally do not have a
Significant effect on the human environment, and therefore do not require
preparation of An environmental assessment or environmental impact statement.

(b) If an agency determines that a categorical exclusion identified in its agency
NEPA Procedures covers a proposed action, the agency shall evaluate the action
for extraordinary circumstances in which a normally excluded action may have a
significant effect.

## FEDERAL RULES OF EVIDENCE

### Rule 201 – Judicial Notice of Adjudicative Facts

(a) Scope. This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

(b) Kinds of Facts That May Be Judicially Noticed. The court may judicially notice a fact that is not subject to reasonable dispute because it:

    (1) is generally known within the trial court's territorial jurisdiction; or

    (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

(c) Taking Notice. The court:

    (1) may take judicial notice on its own; or

    (2) must take judicial notice if a party requests it and the court is supplied with the necessary information.

(d) Timing. The court may take judicial notice at any stage of the proceeding.

# FOREST SERVICE HANDBOOK

**FSH 1909.15 § 31.2 (1992) – Categories of Actions for Which a Project or Case File and Decision Memo Are Required**

Routine, proposed actions within any of the following categories may be excluded from documentation in an EIS or an EA; however, a project or case file is required and the decision to proceed must be documented in a decision memo.

* * *

4. Timber harvest which removes 250,000 board feet or less of merchantable wood products or salvage which removes 1,000,000 board feet or less of merchantable wood products; which requires one mile or less of low standard road construction (Service level D, FSH 7709.56); and assures regeneration of harvested or salvaged areas, where required. Examples include but are not limited to:

a.  Harvesting (FSM 2401.1 and 2401.2) 60,000 board feet of merchantable timber from 100 acres, including the construction of one-half mile of additional roads.
b.  Salvaging (FSM 2435 and 2470.5) an estimated volume of 750,000 board feet of merchantable wood products timber from dead or dying trees, including the construction of one mile of access road, from an area that is generally flat with good drainage.
c.  Thinning (FSM 2431 and 2470.5) an estimated 200,000 board feet of timber from over-stocked timber stands, which requires construction of one-quarter mile of additional access road.

* * *

**FSH 1909.15 § 31.2(10) (2004)**

Hazardous fuels reduction activities using prescribed fire not to exceed 4,500 acres, and mechanical methods for crushing, piling, thinning, pruning, cutting, chipping, mulching, and mowing, not to exceed 1,000 acres. Such activities:

- Shall be limited to areas (1) in wildland-urban interface and (2) Condition Classes 2 or 3 in Fire Regime Groups I, II, or III, outside the wildland-urban interface;
- Shall be identified through a collaborative framework as described in "A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan;"
- Shall be conducted consistent with agency and Departmental procedures and applicable land and resource management plans;

- Shall not be conducted in wilderness areas or impair the suitability of wilderness study areas for preservation as wilderness;
- Shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and may include the sale of vegetative material if the primary purpose of the activity is hazardous fuels reduction.