No. 23-35579

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

OREGON WILD, and WILDEARTH GUARDIANS

Plaintiffs-Appellants,

v.

UNITED STATES FOREST SERVICE, MICHAEL RAMSEY, JEANNETTE
WILSON, RANDY MOORE, and THOMAS VILSACK,

Defendants-Appellees.

_____

On Appeal from the United States District Court for the District of Oregon,
Case No. 1:22-cv-01007-MC, Hon. Michael J. McShane

_____

BRIEF *AMICUS CURIAE* OF AMERICAN FOREST RESOURCE COUNCIL IN
SUPPORT OF DEFENDANTS-APPELLEES

_____

Sarah Melton, Ore. Bar #227050
Sara Ghafouri, Ore. Bar #111021
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, Oregon 97232
(503) 222-9505
smelton@amforest.org
sghafouri@amforest.org

Attorneys for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1(a), *amicus curiae* American Forest Resource Council, an Oregon non-profit corporation, states that it has no parent companies and that no publicly-held corporations own any of its stock.

Dated this 26th day of February, 2024.

Respectfully submitted,

/s/ Sarah Melton
Sarah Melton, Ore. Bar #227050
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, Oregon 97232
(503) 222-9505
smelton@amforest.org

Attorney for *Amicus Curiae*

# TABLE OF CONTENTS

I.  IDENTITY AND INTEREST OF *AMICUS CURIAE*.....................................1

    A.  American Forest Resource Council ......................................1

    B.  Timber Stand And/Or Wildlife Habitat Improvement Categorical
        Exclusion ............................................................................3

II.  LEGAL FRAMEWORK ...............................................................5

III.  FACTUAL BACKGROUND ........................................................9

    A.  The Baby Bear Project......................................................11

    B.  The Bear Wallow Project..................................................12

    C.  The South Warner Project.................................................14

IV.  ARGUMENT.............................................................................15

    A.  The Projects' Activities Fall Within the Plain Meaning of CE-6........16

    B.  CE-6 Does Not Per Se Authorize Commercial Thinning Projects......22

    C.  The Forest Service Has a History of Relying on CE-6 for
        Commercial Thinning Projects............................................24

V.  CONCLUSION ...........................................................................26

**Cases**

*Alaska Ctr. for Env't v. U.S. Forest Serv.*,
   189 F.3d 851 (9th Cir. 1999) ................................................................7, 16, 22, 26

*All. For the Wild Rockies v. Pena*,
   865 F.3d 1211 (9th Cir. 2017) ...........................................................................19

*Ariz. State Bd. For Charter Schs. v. U.S. Dep't of Educ.*,
   464 F.3d 1003 (9th Cir. 2006) ...........................................................................17

*Barnes v. U.S. Dept. of Transp.*,
   655 F.3d 1124 (9th Cir. 2011) .............................................................................5

*California v. Norton*,
   311 F.3d 1162 (9th Cir. 2002) ...........................................................................16

*Conservation Cong. v. U.S. Forest Serv.*,
   No. 2:12-cv-02416-WBS, 2013 WL 2457481 (E.D. Cal. June 6,
   2013) ...................................................................................................................25

*Ctr. for Biological Diversity v. Ilano*,
   928 F.3d 774 (9th Cir. 2019) ...............................................................................9

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
   538 F.3d 1172 (9th Cir. 2008) .............................................................................6

*Ctr. for Biological Diversity v. Salazar*,
   706 F.3d 1085 (9th Cir. 2013) .............................................................................7

*Earth Island Inst. v. Carlton*,
   626 F.3d 462 (9th Cir. 2010) .............................................................................17

*Env't Prot. Info. Ctr. v. Carlson*,
   968 F.3d 985 (9th Cir. 2020) .......................................................................20, 21

*Forestkeeper v. U.S. Forest Serv.*,
   No. 121-CV-01041-DADBAM, 2021 WL 4553885 (E.D. Cal. Oct.
   5, 2021) ...............................................................................................................21

*Heartwood, Inc. v. U.S. Forest Serv.*,
    73 F.Supp.2d 962 (S.D. Ill. 1999), *aff'd*, 230 F.3d 947 (7th Cir.
    2000) ............................................................................................20

*League of Wilderness Defs. Blue Mountains Biodiversity Project v.*
    *Allen*,
    615 F.3d 1122 (9th Cir. 2010) ......................................................17

*Los Padres ForestWatch v. U.S. Forest Serv.*,
    25 F.4th 649 (9th Cir. 2022) ...........................................4, 5, 18, 19

*Milner v. Dep't of Navy*,
    562 U.S. 562 (2011)......................................................................17

*Mountain Cmtys. for Fire Safety v. Elliott*,
    25 F.4th 667 (9th Cir. 2022) ..................................................*passim*

*Native Ecosystems Council v. Marten*,
    2018 WL 6480709 (D. Mont. Dec. 10, 2018), *aff'd*, 800 F. App'x
    543 (9th Cir. 2020)........................................................................19

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ......................................................17

*Native Ecosystems Council v. Weldon*,
    697 F.3d. 1043 (9th Cir. 2012) .......................................................7

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)........................................................................5

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) ......................................................20

*The Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) (en banc) ....................................17, 22

*West v. Sec'y of Dep't of Transp.*,
    206 F.3d 920 (9th Cir. 2000) ..........................................................7

**Statutes**

16 U.S.C. § 2113a(4)(A)(i) .....................................................................13

16 U.S.C. § 2113a(4)(A)(ii) ...................................................................13

16 U.S.C. § 6591b ................................................................................7

16 U.S.C. § 6591d ..........................................................................7, 19

16 U.S.C. § 6591e ..........................................................................7, 19

42 U.S.C. § 4321 .............................................................................5,6

42 U.S.C. § 4331 ..................................................................................6

42 U.S.C. § 4332(C) ...........................................................................6

**Other Authorities**

36 C.F.R. Part 220 ..............................................................................6

36 C.F.R. § 220.6(a) .....................................................................8, 22

36 C.F.R. § 220.6(b) ...............................................................4,8, 22

36 C.F.R. § 220.6(b)(1) ......................................................................8

36 C.F.R. § 220.6(b)(2) ..................................................................8, 9

36 C.F.R. § 220.6(d)(4) ....................................................................20

36 C.F.R. § 220.6(e)(6) ...........................................................3, 8, 18

36 C.F.R. § 220.6(e)(6)(ii) ......................................................3, 8, 21

36 C.F.R. § 220.6(e)(6)(iii) ...............................................................3

36 C.F.R. § 220.6(e)(6)(iv) ........................................................8, 21

36 C.F.R. §§ 220.6(e)(11)–(14) ......................................................18

36 C.F.R. § 220.6(e)(18) ..................................................................14

40 C.F.R. Part 1500 ............................................................................6

40 C.F.R. §§ 1500–1508 ...............................................................5, 6

40 C.F.R. § 1501.4(b) ...................................................................6, 22

40 C.F.R. § 1501.5(c)(1) ........................................................................6

40 C.F.R. § 1507.3(b)(2)(ii) ..................................................................7

40 C.F.R. § 1508.4 .........................................................................6, 8, 22

40 C.F.R. § 1508.9 ..................................................................................6

43 Fed. Reg. 55,978 (Nov. 29, 1978) ....................................................6

51 Fed. Reg. 15,618 (Apr. 25, 1986) .....................................................6

57 Fed. Reg. 43,180 (Sept. 18, 1992) ....................................................3

85 Fed. Reg. 43,304 (July 16, 2020) ......................................................6

87 Fed. Reg. 23,453 (Apr. 20, 2022) ......................................................6

87 Fed. Reg. 76,882 (Dec. 15, 2022) ...................................................15

Fed. R. App. P. 29(a)(2) ........................................................................1

Fed. R. App. P. 29(a)(4)(E) ...................................................................1

# I.     IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

## A.     American Forest Resource Council.

*Amicus Curiae* American Forest Resource Council ("AFRC") is a regional trade association representing over 50 forest product businesses and forest landowners.  Court Record (CR) 27 at 2 (Declaration of Andy Geissler ("Geissler Decl.") ¶ 5).  AFRC advocates for sustained-yield timber harvests on public timberlands in Oregon and throughout the West to enhance forest health and resistance to fire, insects, and disease.  CR 27 at 1 (Geissler Decl. ¶ 4).  AFRC and its members advocate before agencies, legislatures, the public, and the courts.[2]  CR 27 at 1 (Geissler Decl. ¶ 4).

One of AFRC's primary purposes is to advance its members' vital interests in preserving an adequate and reliable supply of timber for their mill facilities from federal lands managed by the Forest Service.  CR 27 at 11 (Geissler Decl. ¶ 29).  Many of AFRC's members rely heavily on federal timber because they do not own

---

[1] In compliance with Federal Rule of Appellate Procedure 29(a)(2), this brief is submitted without need for leave of this Court because counsel for all parties have consented to the filing of AFRC's *amicus curiae* brief in support of Federal Defendants.  Fed. R. App. P. 29(a)(2).  In addition, no party's counsel authored this brief in whole or in part and no party or party's legal counsel contributed money that was intended to fund preparing or submitting this brief.  No person—other than *Amicus Curiae* and its members—contributed money that was intended to fund preparing or submitting this brief.  *See* Fed. R. App. P. 29(a)(4)(E).
[2] For more information about AFRC, *see* http://www.amforest.org/.

their own forestland and, therefore, must purchase timber from national forests to supply their mills.  CR 27 at 11 (Geissler Decl. ¶ 29).  AFRC and its members actively participate in federal agency decisions that involve the protection, management, allocation, and use of both federal and non-federal forest resources in Oregon and throughout the West, and regularly meet with federal land managers from whom its members buy timber.  *See* CR 27 at 2–3 (Geissler Decl. ¶ 6).

AFRC has an interest in improving forest health throughout the West and in Oregon, particularly in light of the devastating fire seasons and uncharacteristically severe wildfires over the past few years, such as the 2021 Bootleg Fire on the Fremont-Winema National Forest.  The three forest treatment projects at issue here—the Baby Bear Timber Stand and Wildlife Habitat Improvement Project ("Baby Bear Project"), the South Warner Habitat Restoration Project ("South Warner Project"), and the Bear Wallow Timber Stand and Wildlife Habitat Improvement Project ("Bear Wallow Project") (collectively, "Projects")—are important to improve forest health and wildlife habitat.  In AFRC's view, the two goals of improving forest health and securing a sustainable timber supply are not mutually exclusive, and accomplishing both is a win-win scenario for the Fremont-Winema National Forest and local communities.

AFRC strongly supports the Forest Service's use of all available management tools to reduce the buildup of wildfire fuels and to improve forest

health on the Fremont-Winema National Forest, where these three important Projects are located.

**B.     Timber Stand And/Or Wildlife Habitat Improvement Categorical Exclusion.**

This case is centered on the Forest Service's use and application of the categorical exclusion ("CE") for "timber stand and/or wildlife habitat improvement" ("timber stand improvement CE" or "CE-6"), which allows forest treatment activities that will improve timber stand conditions and enhance wildlife habitat, subject to certain conditions, without the need to prepare an Environmental Assessment ("EA") or an Environmental Impact Statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA").  36 C.F.R. § 220.6(e)(6).  CE-6 has been relied upon by the Forest Service since 1992—for over three decades—when it was originally part of the agency's Handbook and published in the Federal Register.  57 Fed. Reg. 43,180 (Sept. 18, 1992).

Examples of such timber stand and/or wildlife habitat improvement activities expressly include, but are not limited to, "thinning or brush control to improve growth or to reduce fire hazard" and "prescribed burning to reduce natural fuel build-up and improve plant vigor."  36 C.F.R. §§ 220.6(e)(6)(ii), (iii).  These activities are precisely those that are authorized for the Baby Bear, Bear Wallow, and South Warner Projects, discussed below.  The Forest Service has relied on CE-6 to expedite projects—like the ones at issue here—that involve or use thinning

and prescribed burning to improve forest health, tree stand growth, and reduce fire risk, so long as the agency reasonably determines that there are no extraordinary circumstances for certain enumerated resource conditions present that would warrant additional NEPA analysis. 36 C.F.R. § 220.6(b).

AFRC has a significant interest in ensuring that the Forest Service can continue to rely on CE-6 and has intervened and participated as *amicus curiae* in related cases previously before this Court that addressed the same issue here. AFRC participated as *amicus curiae* in a challenge before this Court to the Cuddy Valley Forest Health/Fuels Reduction Project on the Los Padres National Forest. *Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667 (9th Cir. 2022) (*Mountain Communities*). In *Mountain Communities*, this Court held that CE-6's plain language "unambiguously" did not prohibit the Forest Service from commercial thinning to reduce fire hazard. *Id.* at 672.

AFRC also intervened in a challenge to the Tecuya Ridge Shaded Fuelbreak Project, which abuts the Cuddy Valley Project on the Los Padres National Forest. *Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649 (9th Cir. 2022); *see* ER-237–40; ER-228–232. In *Los Padres ForestWatch*, this Court adopted the reasoning in *Mountain Communities* that CE-6 did not preclude the commercial thinning activities. 25 F.4th at 661. Appellants here joined a coalition of organizations and submitted *amici curiae* briefs in support of the petitions for *en*

*banc* review in *Mountain Communities* and *Los Padres ForestWatch*, both of which were denied. *Mountain Cmtys.*, No. 20-55660 (Dkt. # 60, June 21, 2022); *Los Padres ForestWatch*, No. 20-55859 (Dkt. # 59, June 24, 2022).

AFRC submits this *amicus curiae* brief because it is important for the Forest Service to be able to rely on CE-6 as intended—which unambiguously does not impose an acreage limitation. Accordingly, this brief will address the following three points: (1) these Projects clearly fall within the scope of CE-6; (2) the plain language of CE-6 demonstrates that it does not contain an acreage limitation; and (3) the Forest Service has a history of relying on CE-6 to approve projects that involve commercial thinning. AFRC respectfully requests that this Court affirm the district court's summary judgment order upholding the Forest Service's approval of these three important Projects that seek to reduce wildfire risk and improve wildlife habitat on the Fremont-Winema National Forest.

## II. LEGAL FRAMEWORK

NEPA establishes the procedures by which federal agencies must consider the environmental impacts of their actions but does not dictate substantive results. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Barnes v. U.S. Dept. of Transp.*, 655 F.3d 1124, 1131 (9th Cir. 2011); 42 U.S.C. §§ 4321 *et seq*. Regulations promulgated by the Council on Environmental Quality, 40 C.F.R.

§§ 1500–1508,[3] provide guidance for implementing NEPA, as do the Forest Service's NEPA regulations. 36 C.F.R. Part 220.

NEPA requires federal agencies to consider the impacts of actions that significantly affect the environment. 42 U.S.C. §§ 4321, 4331. An agency must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(C); *see Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008). But an agency may first prepare an EA to determine whether a Finding of No Significant Impact ("FONSI") is warranted or, in the alternative, if there are significant effects that warrant the preparation of an EIS. 40 C.F.R. § 1501.4(b), § 1501.5(c)(1), § 1508.9.

However, an agency need not prepare an EA or EIS if the project fits within specified categorical exclusions, which the agency has determined "do not have a significant effect on the human environment." 40 C.F.R. § 1508.4. Congress has

---

[3] The Council promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), and an amendment to those regulations in 1986, *see* 51 Fed. Reg. 15,618 (Apr. 25, 1986). More recently, the Council modified its NEPA regulations, effective on September 14, 2020, and then rescinded some of those modifications on April 20, 2022, effective on May 20, 2022. 85 Fed. Reg. 43,304 (July 16, 2020); 87 Fed. Reg. 23,453 (Apr. 20, 2022). The issues before this Court arise under the 1978 regulations, as amended in 1986, and all citations to the Council's regulations in this brief refer to those regulations as codified at 40 C.F.R. Part 1500 (2019).

established some CEs by statute, which are subject to specific procedures. *See, e.g.*, 16 U.S.C. § 6591b (insect and disease treatments up to 3,000 acres), § 6591d (wildfire resilience projects up to 3,000 acres), § 6591e (mule deer and sage-grouse restoration activities up to 4,500 acres). Agencies are also directed to establish by regulation their own categorical exclusions for activities that are unlikely to have a significant impact on the environment. 40 C.F.R. § 1507.3(b)(2)(ii). Importantly, "[a]pplication of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013).

Determining whether an action falls within a categorical exclusion implicates substantial agency expertise. *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858–59 (9th Cir. 1999). Courts are generally "most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." *Native Ecosystems Council v. Weldon*, 697 F.3d. 1043, 1051 (9th Cir. 2012) (internal quotation omitted). In addition, "an agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation." *Alaska Ctr.*, 189 F.3d at 857; *see West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 924 (9th Cir. 2000) (stating that a court will not "disapprove of an agency's decision" to apply an exclusion unless the agency

"made a clear error of judgment" (internal quotation marks omitted)).

At issue in this appeal is CE-6. For over 30 years, the Forest Service has relied on CE-6 to approve projects that involve "[t]imber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction." 36 C.F.R. § 220.6(e)(6). CE-6 lists several non-exhaustive, illustrative examples of improvement activities, including "[t]hinning or brush control to improve growth or to reduce fire hazard" and "[p]rescribed burning to reduce natural fuel build-up and improve plant vigor." 36 C.F.R. §§ 220.6(e)(6)(ii), (iv); *Mountain Cmtys.*, 25 F.4th at 680. CE-6 "unambiguously allows the Forest Service to thin trees, including larger commercially viable ones, to reduce fire hazard without having to conduct an EIS or EA." *Mountain Cmtys.*, 25 F.4th at 672.

Even if an action falls under CE-6, the Forest Service's regulations require that the agency first determine that there are no "extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4; 36 C.F.R. §§ 220.6(a), (b). The Forest Service has identified seven "resource conditions" for consideration when determining whether extraordinary circumstances exist. 36 C.F.R. § 220.6(b)(1). However, "[t]he mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion." 36 C.F.R. § 220.6(b)(2). Rather, it is "the degree of the

potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." *Id.* Courts uphold the Forest Service's determination of whether extraordinary circumstances exist where the agency "considered relevant scientific data, engaged in a careful analysis, and reached its conclusion based on evidence supported by the record." *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 783 (9th Cir. 2019).

## III.  FACTUAL BACKGROUND

Oregon has experienced some historic wildfires in the recent past, which is now the new-normal.  In 2021, the Fremont-Winema National Forest experienced the Bootleg Fire, which burned approximately 400,000 acres and was the third largest wildfire in Oregon's history.  CR 27 at 7, 12 (Geissler Decl. ¶ 18, 31); *see also* ER-125.  To address these growing catastrophic wildfire concerns in Oregon, and throughout the United States, the Forest Service has been charged with proactive management of National Forests to better ensure forest resiliency to wildfire events.  *See*, *e.g.*, U.S. Dep't of Agric., *Confronting the Wildfire Crisis: A Strategy for Protecting Communities and Improving Resilience in America's Forests* (Jan. 2022) (providing a 10-year wildfire strategy).[4]

_____

[4] Available at
https://www.fs.usda.gov/sites/default/files/fs_media/fs_document/Confronting-the-Wildfire-Crisis.pdf (last visited Feb. 26, 2024).

The Forest Service authorized three separate, discrete, and much-needed fuel projects on the Fremont-Winema National Forest to reduce fire risk and improve wildlife habitat—the Baby Bear, South Warner, and Bear Wallow Projects. All three project areas are at risk of experiencing severe wildfire events. ER-075; ER-087; ER-113. Appellants attempt to portray the Forest Service's authorization under CE-6 as a single 29,000-acre commercial thinning project when, in reality, the agency approved three separate projects that are geographically distinct and located within two different ranger districts—the South Warner Project is in the Lakeview Ranger District, and the Baby Bear and Bear Wallow Projects are in the Silver Lake Ranger District. ER-113; ER-087; ER-075. Moreover, the Forest Service approved each Project with a separate Decision Memo. ER-075–86; ER-087–97; ER-113–27.

The Forest Service appropriately determined that all three Projects fall within the scope of CE-6, such that the preparation of an EA or EIS is unnecessary, because they involve: (1) thinning to reduce fire risk and prescribe burning to reduce fuel buildup and treatments to improve wildlife habitat; (2) do not include the use of herbicides; (3) do not include more than one mile of road construction; and (4) do not present any extraordinary circumstances. *See* ER-123–24; ER-093–94; ER-082–83. The Forest Service determined that the combination of thinning activities and prescribed burning will reduce tree stand

densities, overcrowding, and wildfire fuel build-up, which in turn improves forest health, plant vigor, and habitat quality, and reduces the potential for and severity of wildfire events. ER-116–17; ER-075–77; ER-088–90.

A. **The Baby Bear Project.**

The Baby Bear Project was approved on May 6, 2022, and authorizes thinning and prescribed burning to reduce timber stand overcrowding, improve forest health, and improve wildlife habitat. ER-088–90. Out of the 4,774-acre project area, commercial thinning is authorized on up to 3,000 acres. ER-088. Thinning and prescribed burning will also improve the condition of summer and transition range habitat for mule deer and make resources available for "shrub and forb growth." *Id*. The Baby Bear Project activities include thinning lodgepole pine and other conifer encroachment, improving meadow habitat and riparian areas for mule deer, elk, bear, and bobcat, and no trees larger than 21-inches diameter at breast height ("dbh") or older than 150 years will be removed. ER-088–89. The Baby Bear Project protects trees in Old-Growth Management Areas by precluding commercial thinning, and the thinning activities will generally favor the retainment of larger and older trees. *Id*. Throughout the Baby Bear project area, forest health will be improved through removal of trees heavily infected with mistletoe. *Id*.

**B.     The Bear Wallow Project.**

The Bear Wallow Project was approved on May 6, 2022, and includes commercial thinning on up to 10,000 acres out of the 17,200-acre project area. ER-076.  The project area contains dense timber stands with considerable build-up of wildfire fuels and conifer encroachment within mixed conifer stands, making the area "highly susceptible to insect and disease as well as wildfire." ER-075.  One of the purposes of the Bear Wallow Project is to reduce overcrowding and canopy cover to achieve the desired levels for mule deer habitat, which are known to migrate through the project area's aspen stands and meadow and riparian habitat.  ER-075–78.  The Forest Service determined that thinning and prescribed burning will create forest edge and foraging areas, balanced with the mule deer's need for hiding and thermal cover.  ER-076–77.  The Project's thinning activities will result in stand densities that reduce competition and fuel loading around ponderosa pine and mature trees, but no tree species 21-inches dbh or larger, or 150 years old or older will be removed.   ER-076–77.  To reduce competition and fuel loading, the Project authorizes thinning of lodgepole pine and white fir trees within 30 feet of mature ponderosa pine trees 9-inches dbh and larger.  *Id*.

The Bear Wallow Project was developed in collaboration with members of the Klamath-Lake Forest Health Partnership collaborative group.  ER-075.  It

will be implemented in partnership with the Oregon Department of Forestry ("ODF") through the Good Neighbor Authority ("GNA"), which allows the Forest Service to enter into partnership agreements with state forestry agencies to conduct "critical management work" for forest health projects on federal lands. ER-075.[5]  Only "forest, rangeland, and watershed restoration services" can be authorized under the GNA, which includes improving wildlife habitat and "activities to treat insect- and disease-infected trees" and "activities to reduce hazardous fuels."  16 U.S.C. §§ 2113a(4)(A)(i), (ii).

Pursuant to a GNA Master Agreement, ODF created the Federal Forest Restoration ("FFR") Program, designed to "accelerate the pace, scale and quality of forest health restoration in Oregon's federal forests."[6]  To achieve this goal, the FFR Program provides financial support for collaborative groups and assistance with NEPA analyses, forest health treatments, and timber sale layout. ER-075.[7]  ODF has been closely involved with planning the Bear Wallow Project

---

[5] U.S. Dept. of Agric., Forest Service, available at
https://www.fs.usda.gov/managing-land/farm-bill/gna (last visited Feb. 26, 2024).
[6] Or. Dept. of Forestry, Federal Forest Restoration Program,
https://www.oregon.gov/odf/working/pages/federal-forest-restoration-program.aspx (last visited Feb. 26, 2024).
[7] *See id*.

since its inception and conducted field surveys for wildlife and heritage resources. CR 27 at 9 (Geissler Decl. ¶ 21).

## C.     The South Warner Project.

Over a hundred years of fire suppression in the South Warner project area has built up considerable fuel loadings, leaving the area at high-risk for severe wildfire, and disease, and insect infestations. ER-113. The project area has more conifer trees than is ecologically sustainable, and conifer encroachment has detrimentally affected the growth and development of tree species in riparian areas, and in aspen, whitebark pine, and mountain mahogany stands due to increased competition for resources. *Id*.

The Forest Service approved the South Warner Project on December 27, 2021, under both CE-6 and the restoration CE, 36 C.F.R. § 220.6(e)(18) (CE-18), because of culvert repair and replacement work to be conducted during stream restoration activities. ER-123–24. During the NEPA planning process, the Forest Service thoroughly engaged with diverse stakeholders regarding the Project's proposed treatment activities. For example, prior to authorization, the Forest Service held two collaborative field trips: one with the Lake County Resources Initiative focused on aspen recovery, prescribed fire strategies, and treatment objectives; and another with the Klamath-Lake Forest Health Partnership. CR 27 at 5 (Geissler Decl. ¶ 13).

To mitigate the impacts of overcrowding and wildfire risks, the South Warner Project authorizes thinning activities in ponderosa pine and white fir stands; plantation and non-commercial thinning; prescribed burning; stream restoration treatments; and meadow/riparian treatments; aspen, juniper woodland, and mountain mahogany treatments; and shrubland treatments. ER-116–20. The South Warner Project involves treatments on approximately 69,567 acres, some of which is focused on improving whitebark pine habitat, which was recently listed as threatened under the Endangered Species Act. ER-113–15; 87 Fed. Reg. 76,882 (Dec. 15, 2022). Out of the entire project area, only 16,000 acres are authorized for commercial thinning. All ponderosa pine 150 years or older, and white fir trees 150 years or older or greater than 30 inches dbh will be retained. ER-116.

## IV.  ARGUMENT

Appellants make two arguments on appeal. First, Appellants raise an as-applied challenge to CE-6 in an attempt to relitigate this Court's prior holding in *Mountain Communities*, claiming the "type" and "scale" of each Project falls outside of the scope of CE-6. Second, Appellants bring a facial challenge to CE-6, asserting that the Forest Service violated NEPA when it adopted the CE in 1992, even though their claim falls well outside of the six-year statute of limitations. AFRC's *amicus curiae* brief will focus on how the Forest Service's site-specific

application of CE-6 to each Project, which unambiguously does not have an acreage limitation, is not arbitrary and capricious and should be upheld.

## A. The Projects' Activities Fall Within the Plain Meaning of CE-6.

Generally, "[a]n agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard." *Alaska Ctr.*, 189 F.3d at 857. The Forest Service's decision to invoke a CE is not arbitrary and capricious "if the agency reasonably determined that a particular activity is encompassed within the scope of" a particular CE. *Mountain Cmtys.*, 25 F.4th at 680; *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002) (noting that an agency's decision that a project qualifies for a CE will be upheld "so long as the application of the exclusion[] to the facts of the particular action is not arbitrary and capricious" (citation and quotation marks omitted)).

Appellants assert that CE-6 does not apply to commercial thinning treatments authorized for these three Projects, emphasizing that the "type and scale" of these Projects exceeds the scope of the CE. Notably, Appellants' arguments solely focus on only the commercial aspects of each Project and do not take issue with the Projects' scale of the non-commercial activities, thereby conceding that the type and scale of non-commercial acreage amounts are irrelevant when determining whether a project falls within the scope of CE-6. But in *Mountain Communities*, this Court held that CE-6's plain language

"unambiguously" did not prohibit the Forest Service from commercial thinning to reduce fire hazard. *Id.* at 672. "The availability of commercial timber is simply a collateral benefit . . . and does not change the purpose or scope of the project." *Native Ecosystems Council v. U.S. Forest Serv*., 428 F.3d 1233, 1248 (9th Cir. 2005); *accord League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1126 n.1 (9th Cir. 2010). As such, Appellants' concession related to non-commercial activities simply reveals that their narrow interpretation of CE-6 myopically focuses on their disapproval of commercial activities.

More importantly, Appellants' argument in support of an acreage limitation is divorced from CE-6's plain text. Courts are directed "neither to add [to] nor to subtract[]" from relevant language. *Ariz. State Bd. For Charter Schs. v. U.S. Dep't of Educ*., 464 F.3d 1003, 1007 (9th Cir. 2006); *Earth Island Inst. v. Carlton*, 626 F.3d 462, 472 (9th Cir. 2010) (quoting *The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc) ("Courts may not impose 'procedural requirements not explicitly enumerated in the pertinent statutes.'")). Appellants seek to "tak[e] a red pen" to the text of CE-6 in a manner that the Supreme Court and this Court have rejected. *Milner v. Dep't of Navy*, 562 U.S. 562, 573 (2011); *Mountain Cmtys*., 25 F.4th at 677–78 (declining to insert the limitation of "precommercial thinning" in CE-6 when it did not appear in the regulatory text).

Had the Forest Service intended to impose an acreage limitation, it would have expressly done so. *See, e.g.*, 36 C.F.R. §§ 220.6(e)(11)–(14).

In *Mountain Communities* and *Los Padres ForestWatch*, this Court recently addressed the proper interpretation of CE-6 and found no such limiting factor under CE-6. In the context of timber stand improvement, this Court acknowledged that "[t]he Forest Service cannot rely on CE-6 without limit" because the "[t]imber stand improvement activities under CE-6 must still improve the composition, constitution, condition, or growth of the tree stand" and the "[p]rojects are also *limited in size* by CE-6's requirement that no more than one mile of low standard road may be constructed to carry out the project." *Mountain Cmtys.*, 25 F.4th at 682 (emphasis added); *see also Los Padres ForestWatch*, 25 F.4th at 661. The same is true with wildlife habitat improvement activities authorized under CE-6. 36 C.F.R. § 220.6(e)(6).

Attempting to limit this Court's clear precedent, Appellants claim the *Mountain Communities* and *Los Padres ForestWatch* decisions are cabined by the Cuddy Valley and Tecuya Ridge Projects' sizes, which were approximately 600 acres and 1,000 acres, respectively. Opening Br. at 24–25. In support of petitions for rehearing *en banc* in *Mountain Communities* and *Los Padres ForestWatch*, both of the *amici curiae* (who are Appellants in this case) asserted that this Court's interpretation of CE-6 would open the flood gates to allow *large-scale* commercial

logging projects to proceed without preparation of an EA or EIS. *Mountain Cmtys.*, No. 20-55660 (Dkt. # 44 at 16); *Los Padres ForestWatch*, No. 20-55859 (Dkt. # 53-1 at 4-5). Despite allegations of a "parade of horribles" that could flow from the panel's interpretation of CE-6, this Court rejected the request for a panel or *en banc* rehearing. *Mountain Cmtys.*, No. 20-55660 (Dkt. # 60, June 21, 2022); *Los Padres ForestWatch*, No. 20-55859 (Dkt. # 59, June 24, 2022).

Appellants assume—without support—that projects larger than the treatment acres in the Cuddy Valley or Tecuya Ridge Projects are of a "type and scale" that will result in significant environmental impacts. As referenced above, Congress has enacted CEs ranging from 3,000 to 4,500 acres for wildfire resiliency projects. 16 U.S.C. § 6591d, § 6591e. Further, this Court has upheld the Forest Service's findings of nonsignificant impact determination or reliance on CE-6 for larger projects. *See, e.g.*, *All. For the Wild Rockies v. Pena*, 865 F.3d 1211, 1215–16 (9th Cir. 2017) (upholding the Forest Service's FONSI determination for a 12,802-acre project that included thinning activities); *Native Ecosystems Council v. Marten*, 2018 WL 6480709, at *2 (D. Mont. Dec. 10, 2018), *aff'd*, 800 F. App'x 543 (9th Cir. 2020) (upholding the Forest Service's 13,000-acre wildlife habitat improvement project approved under CE-6).

In support of their acreage limitation argument, Appellants misrepresent that all other Forest Service CEs that authorize commercial activities impose an

acreage limitation.[8]  For example, the Forest Service allows for commercial activities under the road maintenance CE, or CE-4, which does not include an acreage limitation.  *See* 36 C.F.R. § 220.6(d)(4).  This Court addressed the Forest Service's use of CE-4 in an appeal to a denial of a preliminary injunction and acknowledged that the commercial felling of hazardous dead or dying trees adjacent to roads falls within the scope of the CE-4.  *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 990 (9th Cir. 2020) (*EPIC*).

Appellants rely heavily on *EPIC* to support their argument that the "type and scale" of a project is a limiting factor.  Opening Br. at 33–34.  However, in *EPIC*, this Court determined that, in the context of a preliminary injunction, the plaintiffs were likely to succeed on their claim that some of the project activities fell outside of the scope of CE-4 because it authorized removing some dead or dying trees that were not hazardous to roads because they were too far away and, therefore, the activities did not qualify as road maintenance:  "We have no doubt that felling a

---

[8] Appellants wrongly claim that the regulatory structure or context limits CE-6 to smaller scale thinning projects.  The fact that the Forest Service's promulgation of the former "timber harvest CE" and CE-10 that were later enjoined—*see Heartwood, Inc. v. U.S. Forest Serv.*, 73 F.Supp.2d 962, 975 (S.D. Ill. 1999), *aff'd*, 230 F.3d 947 (7th Cir. 2000) and *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007)—is irrelevant to the issue of whether CE-6 imposes an acreage limitation.  Those cases involved facial challenges to the CEs, whereas this case involves an as-applied challenge to the Forest Service's site-specific application of CE-6 to these three Projects.

dangerous dead or dying tree right next to the road comes within the scope of the 'repair and maintenance' CE.  But the Project allows the felling of many more trees than that."[9]  968 F.3d at 990.  Thus, this Court determined some project activities fell outside of the scope of CE-4 because the trees to be removed were too far away from the road—not because the scale or acreage of the project activities was too large.  *Id.*

Unlike *EPIC*, all three Projects at issue here fall squarely within the scope of CE-6 because they involve activities explicitly included as examples of timber stand improvement or wildlife habitat improvement activities: "[t]hinning or brush control to improve growth or to reduce fire hazard … [and] [p]rescribed burning to reduce natural fuel build-up improve plant vigor."  36 C.F.R. §§ 220.6(e)(6)(ii), (iv).  The Forest Service reasonably explained how the thinning activities—to reduce overstocking, reduce fuel build-up, improve forest resiliency to insect

---

[9] Since *EPIC*, district courts have permitted the Forest Service's use of CE-4 to authorize the commercial removal of hazardous trees along roads, namely the removal of trees "that will imminently fall," because they "have been individually evaluated to have a 'high' or 'moderate' hazard rating" and "are within striking distance of the road, which shall be determined based on the height of the tree." *Forestkeeper v. U.S. Forest Serv.*, No. 121-CV-01041-DADBAM, 2021 WL 4553885, at *7 (E.D. Cal. Oct. 5, 2021) (enjoining project implementation based on this Court's *EPIC* decision but allowing certain commercial hazard tree removal activities to proceed).  Thus, the issue in *EPIC* and its progeny is whether the types of treatment activities are limited to the removal of hazard trees that may strike roads, not the acreage of the project activities themselves.

infestations, disease, drought, and wildfire, and to improve habitat for mule deer, elk, bear, bobcat, bats, other pollinators, migratory birds, raptors, woodpeckers, and other cavity-nesting birds—fell within the scope of CE-6.  ER-75–86; ER-87– 97; ER-113–127.  The Forest Service is entitled to deference on its site-specific "factual determination[s] that implicate[] substantial agency expertise."  *See Alaska Ctr.*, 189 F.3d at 858 n.5; *McNair*, 537 F.3d at 987.

> **B.    CE-6 Does Not Per Se Authorize Commercial Thinning Projects.**

Appellants allege that CE-6 cannot encompass commercial thinning operations because they are reserved for activities with minimal impact.  But Appellants' generalized concerns that commercial thinning activities do not have a "minimal impact" cannot withstand scrutiny because it ignores the backstop of the agency's required "extraordinary circumstances" review.  Even though CE-6 does not impose an acreage limitation, the Forest Service does not have unfettered authority to rely on the CE—the agency must still determine that no extraordinary circumstances exist that would otherwise warrant the preparation of an EA or an EIS.  36 C.F.R. §§ 220.6(a), (b); 40 C.F.R. § 1508.4, § 1501.4(b).  Because the potential environmental effects from the types of activities authorized under CE-6 (timber stand or wildlife habitat improvement) will vary across different locations, not every project to reduce fire risk or improve wildlife habitat can be authorized under CE-6.

Here, the Forest Service found that each Project did not present any extraordinary circumstances that would warrant further NEPA analysis. ER-082–83; ER-093–94; ER-124–25. Tellingly, Appellants *do not* challenge the Forest Service's extraordinary circumstances determinations for each Project. *See generally* Opening Br. Instead, Appellants attack on CE-6 is based on generalized assertions of purported significant impacts from commercial thinning activities, without any support in the record. *See, e.g.*, Opening Br. at 13–14. But CE-6 is not limited—expressly or implicitly—by the amount of commercial thinning; it is limited by the express language in the CE itself. As stated above, any economic benefit from the Projects' authorized activities is merely a collateral benefit.

To the extent this Court has concerns about the scale of each Project, the Forest Service included specific design criteria to minimize environmental impacts from the thinning activities—whether commercial or non-commercial—to resource conditions. For example, the Baby Bear Project's design criteria includes minimizing the impacts from commercial thinning to wildlife habitat, soils, and the spread of invasive species; to help retain snag and old-growth trees; and to limit the impacts from skid trails and landings, among other things. *See, e.g.*, ER-089; *see also* SER-173–83 (design criteria for the Bear Wallow Project); SER-136–40 (design criteria for the South Warner Project).

Overall, the inclusion of commercial thinning did not result in any significant impacts, and instead, provides the Forest Service with a means to help fund portions of the timber stand and wildlife habitat improvement work. Implementation of forest restoration projects through commercial thinning may be desirable to the Forest Service, which may not have the necessary funding or staffing to implement the much-needed restoration work independently. Therefore, commercial thinning is a cost-effective way to improve forest health while making efficient use of the agency's limited resources.

### C. The Forest Service Has a History of Relying on CE-6 for Commercial Thinning Projects.

Appellants misrepresent that the Forest Service's reliance on CE-6 for commercial thinning projects is a recent sea-change from past agency practice. Opening Br. at 23. The Forest Service has a history of using CE-6 to authorize timber stand and/or wildlife habitat improvement projects that also involve commercial thinning. *See, e.g.*, CR 27 at 13–14 (Geissler Decl. ¶ 34) (the 2017 Bull Run Roadside Hazard Tree Mitigation Project on the Sequoia National Forest authorized 3,500 acres of commercial harvest); *id.* (the 2018 Spear Creek Roadside Hazard Tree Mitigation Project on the Sequoia National Forest authorized 1,250 acres of commercial harvest); ER-255–57 (the 2,280-acre 2014 Cordovas Restoration Thinning and Prescribed Fire Project on the Santa Fe National Forest included commercial thinning); ER-280–84 (the 990-acre 2006

Jack Creek and Rock Creek Meadows Fuels Reduction and Meadow Restoration Project included commercial thinning); *see also Conservation Cong. v. U.S. Forest Serv.*, No. 2:12-cv-02416-WBS, 2013 WL 2457481, at *1 (E.D. Cal. June 6, 2013) (the 2012 Tatham Ridge Fuels Project relied on CE-6 and included 879 acres of fuel break construction, though the court ultimately held the Forest Service's no extraordinary circumstances determination was arbitrary and capricious). The Forest Service's demonstrated history of relying on CE-6 for commercial treatment projects undercuts Appellants' assertion that there was a stark change in policy in 2018 in response to Executive Order 13855. Opening Br. at 23; ER-234–35.

In sum, Appellants' unsupported policy concerns do not justify narrowing the scope of CE-6 to some arbitrary "scale" or acreage limitation. Such an interpretation of CE-6 has no support in the plain language of the regulation, is contrary to settled precedent from this Court, and would have broad implications that would unnecessarily impede the Forest Service's ability to expedite much needed forest health and wildlife improvement projects. Moreover, Appellants' generalized concern about the scale of the Projects ignores the backstop of the required extraordinary circumstances review. As such, the Forest Service's site-specific application of CE-6 to encompass the

activities authorized by these Projects is entitled to deference and should be upheld.  *See Alaska Ctr.*, 189 F.3d at 858 n.5.

## V.    CONCLUSION

For the reasons stated above, this Court should affirm the district court's judgment and uphold the Baby Bear, Bear Wallow, and South Warner Projects, which are important projects that will reduce wildfire effects and improve wildlife habitat.

Respectfully submitted this 26th day of February, 2024.

/s/ Sarah Melton
Sarah Melton, Ore. Bar #227050
Sara Ghafouri, Ore. Bar #111021
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, Oregon 97232
(503) 222-9505
smleton@amforest.org
sghafouri@amforest.org

Attorneys for *Amicus Curiae*

## STATEMENT OF RELATED CASES

Counsel is aware of no related cases within the meaning of Circuit Rule 28-2.6.

DATED this 26th day of February, 2024.

/s/ Sarah Melton
Attorney for *Amicus Curiae*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**   23-35579

I am the attorney or self-represented party.

**This brief contains  5,870 words,** including **0** words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ x ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.
[  ] complies with the length limit designated by court order dated _____.
[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**  /s/ Sarah Melton                    **Date** February 26, 2024

*(use "*s/[typed name]*" to sign electronically-filed documents)*

28

## CERTIFICATE OF SERVICE

I hereby certify that for Case No. 23-35579, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF on February 26, 2024. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED this 26th day of February, 2024.

/s/ Sarah Melton
Attorney for *Amicus Curiae*